NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

DUNCAN FOUNDRY AND MACHINE
WORKS, INC., Respondent.

No. 18091.

United States Court of Appeals,
Seventh Circuit.

Dec. 1, 1970.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Robert A. Giannasi, David E. Rosenbaum, Attys., N. L. R. B., for petitioner.

Alan I. Berger, Gerald Tockman, McMahon & Berger, St. Louis, Mo., Robert B. Maucker, Hoagland, Maucker, Bernard & Almeter, Alton, Ill., for respondent.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

HASTINGS, Senior Circuit Judge.

This matter is before us on application of the National Labor Relations

Board pursuant to Section 10(e) of the National Labor Relations Act, as amended, Title 29 U.S.C.A. §§ 151 et seq., 160(e), for enforcement of its order dated May 29, 1969, and reported at 176 NLRB No. 31, amending and adopting the Trial Examiner's Recommended Order.

The order, as amended, directed respondent Duncan Foundry and Machine Works, Inc., Alton, Illinois (Company) to cease and desist from violating Section 8(a) (3) of the Act, Title 29 U.S. C.A. § 158(a) (3),[1] by withholding vacation pay or other vacation benefits from striking employees who did not return to work prior to the termination of the strike, and by denying to striking employees recalled after termination of the strike seniority rights and privileges relating to priority of employment when it restores or reduces its work force. It further ordered the Company to cease and desist from violating Section 8(a) (1) of the Act, Title 29 U.S.C.A. § 158(a) (1),[2] by engaging in like or related conduct that interferes with, restrains or coerces employees in the exercise of rights guaranteed by Section 7 of the Act, Title 29 U.S.C.A. § 157.[3] Affirmatively, the Company was ordered (a) to pay to striking employees who did not return to work before September 13, 1967, vacation pay withheld from them under the same formula used by the Company to compute the amounts paid to employees who did receive vacation pay in 1967, with interest from September 21, 1967; (b) to restore to the striking employees recalled as "temporary employees" after the termination of the strike their seniority rights; and (c) to make pertinent records available for Board inspection and to post appropriate notices.

The Company is engaged in the manufacture of steel castings and patterns. Prior to January 29, 1967, it employed approximately 350 production and maintenance employees and approximately 30 machine shop employees. From 1942 until 1966 the Company recognized, and executed successive collective bargaining agreements with, the Employees' Association of Duncan Foundry and Machine Works, Inc. (Employees' Association).

On February 21, 1966, United Steelworkers of America, AFL–CIO (Union) filed a petition with the Board for representation of the Company's employees. The Union won the subsequent Board-conducted election and was certified as the employees' collective bargaining agent.

Beginning October 4, 1966, the Company and the Union engaged in numerous bargaining sessions in an attempt to reach a collective bargaining agreement. After reaching an impasse, the Union called an economic strike on January 29, 1967. Shortly thereafter, the Company sent a memorandum to the employees stating that strikers who did not return to work by February 22, 1967, would be permanently replaced.[4] No new employees were hired to replace the strikers who did not return.

---

1. Section 8(a) (3) of the Act provides, *inter alia*:
"Sec. 8. (a) It shall be an unfair labor practice for an employer—
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

2. Section 8(a) (1) of the Act provides:
"Sec. 8. (a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7."

3. Section 7 of the Act provides, *inter alia*:
"Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, * * *."

4. At the onset of the strike, about 106 employees remained at work and approximately 244 employees participated in the strike. Approximately 44 employees returned to work before the strike ended.

Negotiations continued between the Union and the Company until the Employees' Association filed a representation petition on September 13, 1967. The Company filed a petition questioning the Union's representative status the next day.[5]

The Company shut down for two weeks in August of 1967 for maintenance and repairs. Approximately 55 employees continued to work during this period and the rest who were on the payroll did not work. All such nonstriking employees were paid a minimum of two weeks' wages, and those who worked during the shutdown received their regular wages as well.[6] Strikers who returned to work between the shutdown and the filing of the Employees' Association petition received a minimum of two weeks' pay, but no other strikers received any vacation benefits.

On January 31, 1968, the Union notified the Company that it was terminating the strike and, on behalf of the strikers, offered unconditionally to return to work. In March and April of 1968, the Company recalled approximately 40 workers as "temporary" employees, and two "permanent" employees. The former strikers returned to their old jobs and were assigned to perform the work they had performed prior to the strike at their former rates of pay.

The Company kept separate lists of "permanent" employees and "temporary" employees. The "permanent" list contained all of the employees who had abandoned the strike prior to its termination and the nonstrikers. It also included two former strikers who were recalled as "permanent" employees. The list of "temporary" employees included the rest of the recalled strikers.

The Company reduced its workweek twice but retained all employees. The notice of the second reduction stated that if there were no increase in production, the Company would return to a five-day week and reduce the number of "temporary" employees.

Both the trial examiner and the Board found that the denial of vacation benefits to striking employees who did not return before September 13, 1967, and the threat of layoff to the "temporary" employees constituted violations of Section 8(a) (3) and (1), *supra*.

We consider first respondent's threshold contention that it was denied due process of law in the Board proceedings. Respondent claims that it was not sufficiently apprised of the alleged wrongs committed and the persons allegedly wronged.

█ It is well settled that a valid complaint requires only a plain statement of the things claimed to constitute an unfair labor practice so that respondent may be put upon his defense. American Newspaper Pub. Ass'n. v. N. L. R. B., 7 Cir., 193 F.2d 782, 800 (1951), aff'd on other grounds, 345 U.S. 100, 73 S.Ct. 552, 97 L.Ed. 852. Even where a complaint is devoid of notice of the unfair labor practice found, due process is satisfied by full litigation of the issues. N. L. R. B. v. Johnson, 6 Cir., 322 F.2d 216, 220 (1963), cert. denied, 376 U.S. 951, 84 S.Ct. 968, 11 L. Ed.2d 971.

█ In the instant case, we think it clear that respondent was given adequate notice of the acts which constituted violations as well as of the employees affected. Additionally, our review of the record indicates all issues relating to the vacation pay and seniority denial discriminations were fully litigated.

The Union's charge against the Company alleged, in substance, that it paid vacation benefits to nonstrikers and employees who abandoned the strike, but discriminatorily refused to pay to strik-

---

5. The petitions were consolidated in Bd. Case Nos. 14–RC–5787 and 14–RM–327. The Union won the ensuing election and was recertified as the bargaining agent of the employees on December 4, 1968.

6. Employees who, under the provisions of an expired 1963 contract between the Employees' Association and the Company, earned more than two weeks' vacation, were paid the additional amounts accrued.

ers "vacation benefits earned by them during the period of their employment prior to the initiation of said strike" and that the Company discriminatorily denied seniority to recalled strikers who did not abandon the strike. The General Counsel's complaint charged, *inter alia*, that the Company discriminated (1) against certain strikers by paying vacation benefits to nonstrikers and employees who abandoned the strike and denying the same benefits to strikers and (2) against returning strikers by denying them their seniority rights and granting superseniority to nonstrikers and those who had abandoned the strike. The General Counsel complied with an order for a bill of particulars on the nature of the seniority and superseniority rights.

Prior to and at the beginning of the hearing, for the record, General Counsel informed the Company's counsel that the period of accrual of vacation benefits for strikers ran from May 1, 1966 to the beginning of the strike on January 29, 1967.[7] During the hearing, the Company admitted that it denied vacation benefits to all strikers who had not abandoned the strike and returned to work prior to September 13, 1967, and seniority rights to all returning strikers designated as "temporary employees".

Obviously, the Company was apprised of the occurrences which were alleged to be violations of the Act.

Respondent complains, however, that the General Counsel failed to plead and delineate adequately the class of employees involved. Specifically, respondent asserts that the General Counsel's refusal to state whether the discriminatees included or did not include striking employees who quit their employment, those who engaged in picket line violence and those who were permanently replaced, "goes to the very heart of the 'offense' attempted to be stated—the

question of whether or not the supposed 'rights' were earned."

█ We disagree. At the enforcement stage of this proceeding, the relevant inquiries are into discriminations against an identifiable class. The charge stated that the discriminatees were strikers who had been denied vacation pay and recalled strikers who were denied seniority rights. The strikers who were allegedly denied vacation pay were on the Company's payroll records, and the recalled strikers who were allegedly denied seniority rights were on the Company's own list of "temporary" employees.

The question of class composition posed by respondent would require the determination of each striking employee's status within the class prior to a finding of discrimination. For convenience, such matters are properly considered in the compliance stage of the case, after the question of discrimination has been definitively settled. N.L.R.B. v. C.C.C. Associates, Inc., 2 Cir., 306 F.2d 534, 539 (1962). The Company will have an adequate opportunity to object to the inclusion of individual members in the class at that time.

There was no denial of due process either in the proceedings before the Trial Examiner or the Board in this case. The Company was apprised both of the nature of the acts complained of and of the employees allegedly discriminated against.

With respect to the vacation pay, the Board found that the Company applied the terms of an expired 1963–1966 Employees' Association-Company contract and past practices in granting vacation benefits to nonstrikers and former strikers; that many of the strikers earned vacation pay based upon time worked from May, 1966 until January 29, 1967; that the terms of the expired contract required employee status, not physical attendance on the payroll, as of May 1;

---

7. Respondent's counsel was apprised by the examiner that he would consider a motion for a continuance at the close of the hearing to meet any surprise from General Counsel's statement for the record. Respondent made no such motion.

and that the strikers were employees on the qualifying date, May 1, 1967. The Board concluded that the two classes of employees were distinguishable only by participation in protected activity. The Company's actions were held discriminatory and destructive of important employee rights and, in the absence of a legitimate or substantial business justification, violative of the Act.

Factual findings of the Board may not be set aside unless unsupported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487–488, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N.L.R.B. v. United States Railway Equipment Co., 7 Cir., 424 F.2d 86, 89 (1970); Revere Camera Co. v. N.L.R.B., 7 Cir., 304 F.2d 162, 164 (1962). Nor may inferences reasonably drawn by the Board be set aside simply because we would not have drawn them. N.L.R.B. v. Southern Bell Telephone & Telegraph Co., 319 U.S. 50, 60, 63 S.Ct. 905, 87 L.Ed. 1250 (1943); N.L.R.B. v. United States Railway Equipment Co., *supra*, 424 F.2d at 89; Revere Camera Co. v. N.LR.B., *supra*, 304 F.2d at 164.

The record amply demonstrates that the Board's determinations are supported by substantial evidence. The president of the Company, Duncan, testified that payments to the employees in the nature of vacation pay in 1967 were granted in accordance with past practices similar to the practice set forth in Article XI of the 1963–1966 Employees' Association contract. He testified that the only difference between the practice followed in 1967 and the practice in the expired contract was the name given the benefits, "money for time not worked" in 1967 and "vacation pay" under the contract. Clearly the Board was justi-

fied in finding that the Company applied the terms of the expired contract.[8]

Article XI provided, in substance, that persons employed by the Company on May 1, who had received earnings in at least 60% of the pay periods in the twelve months preceding May 1 and who had been in continuous full time service, were entitled to receive vacation benefits based on length of service.

The Company stipulated that a majority of the striking employees did work continuously and receive earnings in every pay period from May 1, 1966 until the beginning of the strike, January 29, 1967. Those employees had thus satisfied the requirements of prior service and earnings necessary for accrual of vacation pay.

In N.L.R.B. v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L. Ed.2d 1027 (1967), the Supreme Court held that a company's refusal to pay vacation benefits to strikers was discrimination in its simplest form capable of discouraging union membership. In such circumstances the Court stated that the burden was on the employer to establish that he was motivated by substantial and legitimate business objectives since the proof was most accessible to him. In the absence of such proof the Court held that the Board's finding of a violation of the Act was supported by substantial evidence.

The Company argues, however, that the Board is not entitled to the discriminatory motive inference of N.L.R.B. v. Great Dane Trailers, Inc., *supra*. In *Great Dane* the employees were denied vacation benefits that had clearly accrued and the sole basis for the discriminatory treatment was participation in protected activity. Company contends, on the other hand, that the Duncan Foundry employees did not earn vaca-

8. Respondent points out that the Company and the Union had executed a written cancellation of all practices and contract provisions extant before the Union's certification and had agreed that all matters involving terms and conditions of employment would be resolved on a day-to-day basis at the bargaining table. Certainly, the Company was under no duty to apply the terms of the expired contract, but the nature of the complaint is that if the terms were applied, they could not be applied discriminatorily.

tion pay because they could not satisfy an alleged condition precedent, active work either on May 1, 1967 or in the period from May 1 to October 1, 1967.[9] Relying on Pittsburgh-Des Moines Steel Co. v. N.L.R.B., 9 Cir., 284 F.2d 74 (1960), and N.L.R.B. v. Community Shops, Inc., 7 Cir., 301 F.2d 263 (1962), Company maintains that there must be independent proof of discriminatory motive to show a violation of the Act when the difference in treatment results from failure to fulfill a condition precedent as distinguished from participation in protected activity.

■ Article XI, section H, subsection (1) of the expired contract provides *inter alia*: "(1) No employee shall be entitled to vacation pay unless he is an employee of the Company on May 1st * * *." Obviously, the contract language does not require active work for the accrual of vacation benefits. The Board's finding to that effect was supported by substantial evidence.

■ Moreover, if there were an active work rule in effect, the Company would have to show that such rule was justified by substantial business reasons. An argument similar to the one made by the Company was made in N.L.R.B. v. Frick Company, 3 Cir., 397 F.2d 956 (1968). In that case the vacation plan operative at the time of the alleged discriminations explicitly required presence on the payroll as of a certain date in order for an employee to qualify for vacation benefits. Striking employees were removed from the payroll pursuant to a longstanding company rule providing for such removal after an unauthorized or unexplained absence of seven consecutive calendar days. Frick contended that it merely applied the longstanding rule to the strikers as it would have applied to

any other employee. The court held the action discriminatory on its face and placed the burden on the employer to establish that it was motivated by legitimate business objectives. 397 F.2d 956, 961–963.

In the case at bar, as in *Frick,* the effect of the alleged active work rule is to deny strikers vacation benefits while granting such benefits to nonstrikers and strikers who returned before the end of the strike. It is discriminatory on its face and could adversely affect employees in their exercise of the right to strike. The burden is, therefore, on the Company to establish that it was motivated by legitimate objectives. N. L.R.B. v. Great Dane Trailers, Inc., 388 U.S. 26, 34–35, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).

The Company's reliance on Pittsburgh-Des Moines Steel Co., *supra,* and Community Shops, Inc., *supra,* is misplaced. In *Pittsburgh-Des Moines Steel* the court found that poor productivity was a valid business justification for refusing to pay a Christmas bonus to production and maintenance workers who had been on strike. Even though the poor productivity was necessarily dependent upon the protracted walkout, the employer had a right to reward and encourage the productivity aspect of business and absent a showing of intent to discourage employees in the exercise of their Section 7 rights, could not be charged with violating the Act. Similarly, in *Community Shops, Inc.,* this court found evidence of a legitimate business motivation in a rehire formula that effectively caused discrimination between strikers and nonstrikers.

■ There is no showing of a substantial business justification for the alleged active work rule in the instant case. On

9. The Company points to the following as evidence of the "active work" condition precedent: Article XI, section H, subsections (1) and (3) providing that if employment is terminated prior to May 1 no benefits would accrue; in the sole layoff since 1960, employees who did not return to active work in the period from May 1–October 1, 1960 did not earn and were not paid vacation benefits; and the Union was clearly aware of the condition precedent nature of the active work requirement because it bargained unsuccessfully to have strike time treated as actual work time.

review, we may not speculate upon what might have motivated the Company. N.L.R.B. v. Great Dane Trailers, Inc., *supra*, 388 U.S. at 35, 87 S.Ct. 1792. The Company failed to meet its burden of proof and the active work rule may not be used to justify its discrimination.

The Company contends that it lost a substantial amount of business as a result of the strike. The work force required by the Company was thereby reduced, and the net effect was to permanently replace the strikers by nonstriking employees and by strikers who returned. Therefore, it is argued, there is no right to the vacation pay remedy. We are not persuaded by this contention. The assessment of the Company's economic condition occurred September 21, 1967, more than four months after the date the Board found that the vacation benefits accrued, May 1, 1967.

■ Further, the Board properly held that the economic strikers maintained their status as employees under Section 2(3) of the Act, Title 29 U.S.C.A. § 152(3).[10] The Supreme Court has recognized that often a strike will have an effect on the level of production and the number of jobs. But the status of the striker as an employee does not terminate until he has obtained other regular and substantially equivalent employment.[11] N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. 375, 381, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967).

■ The Company finally argues that the unfair labor practice charge based on vacation pay discrimination was barred by the Act's statute of limitations, Section 10(b), Title 29 U.S.C.A. §

160(b).[12] The charge was filed on March 20, 1968, more than six months after the two dates of discrimination alleged by the Company. The first of such dates was August 28, 1967, when the Company negotiator flatly denied the Union's request for striker's vacation benefits in a sidebar meeting. The second was September 11, 1967, when the last returning striker was paid.

The Board held that the Company's denial was no sooner than a letter to striking employees in response to their written and oral inquiries dated September 21, 1967. The letter from the Personnel Manager, E. J. Green, provided in its relevant parts:

"This letter is to inform you that the Company is presently making a study of the vacation eligibility as it applies to those who have already made request as well as those who have not done so.

"As soon as the study is completed and a determination made, you will be informed of our decision."

Clearly, the letter carries no unequivocal denial of vacation benefits, and, indeed, indicates that the strikers may receive vacation pay after a study. The Board's finding that the discrimination occurred less than six months prior to the filing of the charge is thus supported by the letter.

■ On the basis of the foregoing, we find the Board properly held that the Company violated Section 8(a) (3) and (1) of the Act by denying vacation pay to striking employees who did not abandon the strike prior to September 13, 1967.

---

10. Section 2(3) of the Act provides, *inter alia*:

"Sec. 2. When used in this subchapter—
(3) The term "employee" * * * shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute * * *, and who has not obtained any other regular and substantially equivalent employment, * * *."

11. The determination of employee status is deferred until the compliance stage of

the proceedings. The convenience of this method is amply demonstrated by the Board Counsel's statement on oral argument that the Company objects to the employee status on each of over 170 men.

12. Section 10(b) of the Act provides, *inter alia*:

"Sec. 10. (b) * * * [N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board * * *."

The trial examiner and the Board on disparate theories held the denial of seniority rights to the recalled "temporary" employees to be a violation of Section 8(a) (3) and (1) of the Act, *supra*.

The trial examiner found that the recalled employees were recalled temporarily to meet an emergency order, but that there was no substantial business or economic justification for the refusal to grant seniority rights and privileges. The Board, on the other hand, held that the strikers were recalled "for an indefinite, indeterminate period, and had a reasonable expectancy of continued employment. * * *" 176 NLRB No. 31, at 7. Thus, as regular employees, they were entitled to the seniority rights accumulated prior to the strike.

■ Respondent's counsel urged on oral argument that the Board did not have the right to change the trial examiner's "temporary employee" determination because no exception was taken to that finding.[13] We do not agree. There is no difference in the fundamental view taken in the instant case. *Cf.*, F. W. Means & Company v. N.L.R.B., 7 Cir., 377 F.2d 683 (1967). Rather, the Board affirmed its trial examiner's rulings that the refusal to grant seniority was unlawful but disagreed with part of his analysis. The Board is free to use its own reasoning and is not bound by that of the trial examiner. N.L.R.B. v. WTVJ, Inc., 5 Cir., 268 F.2d 346 (1959).

■ The Board's holding that the recalled strikers were regular employees instead of temporary employees is supported by substantial evidence. No replacements were hired for any of the strikers. The forty recalled employees were assigned the same jobs under the same conditions they held before the strike (with the exception of seniority rights). When recalled, the employees were told nothing about their job status except that it was "temporary" to help fill a customer's inventory error. When they inquired about their seniority, they were told the Company had no answer for them.

These employees survived two workweek reductions *after* the temporary increase in production had admittedly ended. At the time of the hearing the forty "temporary" employees were still working for the Company on the same basis as the other employees. Moreover, Company President Duncan admitted at the hearing that he was unsure which employees would or would not stay on permanently and that he did not know "how long the situation would last."

On the foregoing facts, we conclude the Board was justified in finding the strikers were recalled on a regular basis. The Board was not limited by the Company's inconsistent nomenclature. *Compare,* Trinity Valley Iron & Steeel Co. v. N.L.R.B., 5 Cir., 410 F.2d 1161, 1170 (1969); Automation & Measurement Div., Bendix Corp. v. N.L.R.B., 6 Cir., 400 F.2d 141, 148 (1968).

Since the forty recalled employees were held to be regular, and not temporary, employees, they were entitled to full reinstatement rights. We agree with the Board that the dichotomy between them and the rest of the employees created by the Company's notice that the "temporary" employees would be laid off first in the event of a reduction in force, in effect, granted superseniority to the nonstrikers. Such conduct is inherently destructive of important employee rights and discourages union membership. N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L. Ed.2d 308 (1963). In the absence of any substantial business justification, the Board's holding that the Company violated Section 8(a) (3) and (1) of the Act, *supra,* was supported by substantial evidence. Universal Camera Corp. v. N. L.R.B., *supra.*

Accordingly, we shall grant enforcement of the Board's order. It is so ordered.

Enforcement granted.

13. See N.L.R.B. Rules & Regulations, Series 8, § 102.46(h), 29 C.F.R. § 102.46(h).