**DUNCAN FOUNDRY & MACHINE WORKS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 71–1014.

United States Court of Appeals, Seventh Circuit.

April 6, 1972.

Alan I. Berger, St. Louis, Mo., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Marion Griffin, Atty., N. L. R. B., Washington, D. C., for respondent.

Before CASTLE, Senior Circuit Judge, and KILEY and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

This case is a sequel to N. L. R. B. v. Duncan Foundry & Machine Works, Inc., 435 F.2d 612 (7th Cir. 1970), in which we enforced an order directing the Company to desist from discrimination against striking employees who had returned to work after a prolonged strike which ended on January 31, 1968. In this case, the Company seeks review of the Regional Director's rulings on its challenges to the ballots of the striking employees who voted at an election conducted a few days before the strike ended.

The Union won the election by a narrow margin, objections and challenges were duly filed, each was investigated in detail, most were overruled, the Union was certified, the Company refused to bargain in order to preserve its right to review of the election procedures, and, at long last, the matter is before us for decision. The Company argues that certainly at least four of its rejected challenges had merit; if so, the outcome could have been different and the election must be set aside.

■ Without reciting the procedural history in detail, it is sufficient to state that we agree with the Company's contention that we have jurisdiction to review the entire record, including proceedings, in the representation and election case. The basic question for decision is whether, at some stage of the proceedings, the Company should have been accorded an adversary, evidentiary hearing on either (a) its challenges to the ballots of individual striking employees or (b) its claim that the jobs of substantially all striking employees had been terminated by a permanent loss of business during the strike.

The Company acknowledges that "the objecting party to a Board election procedure has the burden of proving by specific evidence that substantial and material issues of fact existed which could only be resolved through the procedural safeguards of an evidentiary type hearing." [1] The question is whether it offered such "specific evidence" to the Regional Director, the Trial Examiner or the Board. We shall comment on its basic objections separately.

A.

The ballots of 186 employees were challenged, 8 by the Union and 178 by the Company. On February 16, 1968, the Regional Director wrote to the parties requesting each to submit "a statement of its position as to the eligibility of each of the individuals named above, together with any evidence it wishes to have considered in support thereof." [2]

■ On April 5, 1968, the Company submitted a lengthy document entitled "Statement of Company's Position."[3] It is this document which contains the "specific evidence" which the Company relies on as having established its entitlement to an adversary hearing.

In response to this filing, the Regional Director made a comprehensive investigation of each of the challenges made by the parties and set forth, in writing, his findings as to each. He sustained six of the Company's challenges and overruled the remainder. It would unduly prolong this opinion to discuss each challenge, or each category of challenges. We have studied the Company's entire submission, as well as the full report of the Director, and are satisfied that the judgments which he made were well within the area of his discretion, and

1. Co.Br. p. 15. Petitioner agrees with the following statement of the law in NLRB v. Singleton Packing Corp., 418 F.2d 275, 280 (5th Cir. 1969):
   "There must be 'specific evidence of specific events from or about specific people' in support of allegations having a basis in law sufficient to overturn the election." Co.Br. p. 14.

2. Supplemental Appendix p. 13.

3. A. 192–242.

that his investigation did not reveal the need for an adversary hearing.

The Company objected most vehemently to the fact that the Regional Director counted the ballots of six employees[4] who had executed "quit slips" and accepted employment elsewhere. The first employee named by the Company was Eddie Arnold, who, according to the statement, formally resigned on June 19, 1967, withdrew from the profit sharing plan, and was permanently employed by the Alton School Board.[5]

The Regional Director verified the fact that Arnold had executed a quit slip and withdrawn from the plan; he nevertheless concluded that Arnold had not voluntarily resigned. His investigation disclosed that Arnold had approximately 16 years of seniority at Duncan and his pay scale was about $2.58 per hour. His substitute employment with the School Board was as a janitor earning $360 a month. It is no doubt correct that the new job was "permanent" in the sense that Arnold would retain it if nothing better was available; it seems equally clear, however, that the Regional Director could properly conclude that Arnold told the truth when he said that he would prefer to return to Duncan.[6] The Regional Director concluded that the quit slips executed by Arnold and the others were consistent with a need to establish eligibility for interim employment elsewhere and did not necessarily demonstrate a permanent resignation.

The Director's findings set forth in detail the basis for his conclusions as to each challenged striker. In many cases, such as Arnold's, he found that the Company's factual statements were accurate, but he considered them insufficient to demonstrate the kind of permanent employment elsewhere that would disqualify the striker from retaining his eligibility to vote. In such cases, since the "specific evidence" offered by the Company was not disputed, no need for any evidentiary hearing was established.

In many other cases, the Regional Director found that the Company's information (which often took the form of a conclusory allegation in its "statement of position") was simply incorrect. In such cases, the Company argues, an evidentiary hearing was required to resolve the apparent conflicts. In most of those cases, however, the Company had presented no actual evidence in advance and had subsequently made no offer to show that the Regional Director's findings were incorrect. Since much of the data (such as the name of the striker's substitute employer) was readily subject to verification, we have no doubt that the Regional Director correctly set forth accurate information and that the Company's original tender was inaccurate. We might have a different problem if, subsequent to the Regional Director's report, the Company had made another submission of "specific evidence" which tended to cast doubt on the validity of

---

4. Arnold, Bruns, Farris, Knoche, Kain and Delp.

5. The portion of the Company's statement pertaining to Arnold read as follows:
   "1) Arnold, Eddie. Formally resigned on June 19, 1967, and withdrew his shares in the profit sharing plan. Mr. Arnold was permanently employed by the Alton School Board before the election was conducted. Company Exhibit 6 (a) is a copy of his resignation, 6(b) is a copy of a letter showing receipt of profit sharing funds, both exhibits are attached hereto and made a part hereof." A. 204.

6. A question of "intent," absent objective evidence, may well require a hearing. Here, however, intent was relied upon as corroborative of the inferences drawn from the objective evidence. The Director, in the exercise of his discretion, could conclude that it is unlikely that one would give up a higher paying job with established seniority for a lower paying job with no assurance of continued employment. The worker's own statement reinforces the reasonableness of this conclusion by the Regional Director. Arnold may well have withdrawn his profit sharing funds simply because he needed money during the strike.

the results of the Regional Director's investigation.[7]

■ It is true, as the Company argues, that there are a few instances in the 84-page detailed decision in which the Director appears to have erred, but we regard them as of minor importance and clearly insufficient to support the Company's request for an evidentiary hearing.[8] On the whole we are favorably impressed with the thoroughness and impartiality with which the investigation appears to have been conducted.[9]

7. We might also have a different problem if the original "specific evidence" had included more "evidence" and fewer conclusory allegations. For example, the Company lists 75 names with nothing more than statements, "He secured *permanent* [emphasis the Company's] employment with. . . . " A. 208–213. The Company was asked by the director's letter of February 16, 1968, to submit not only a "statement of position" but also "any evidence it wishes to have considered in support thereof." (Supplemental Appendix, p. 13.) An offer to prove a fact, or an allegation of fact, is not evidence. An affidavit from the replacement employer would have been evidence, at least as to the fact of other employment, though it may not have been sufficient on the permanence question. (The Company did submit one letter from an employer stating that two strikers had "applied" for employment and had stated on their applications that they had "quit" Duncan.) It is not unreasonable to expect the Company to present such affidavits, since, if the hearing it requested had been held, presumably some of its evidence would have been submitted in affidavit form rather than by calling all 75 employers to ask them if any of the strikers had been on their payroll. Thus, we do not think the Company can properly be heard to complain if the Director's investigation shows a different employer or interim rather than permanent employment. There is no conflict with evidence presented by the Company, because it presented only an allegation. In fact, it presented little actual evidence on any of its 172 challenges. It did present "quit slips" for some employees, and documents indicating withdrawal of funds from the profit sharing plan. However, the Director accepted this evidence as accurate, but concluded, from other evidence which he gathered, that the inferences to be drawn from the Company's evidence were not the inferences which the Company sought to draw. The Director explained in detail why he drew contrary inferences. Some factors were the rate of pay at the replacement job, the seniority at Duncan which would be sacrificed by remaining at the replacement job, the distance from home of the replacement job as compared with the Duncan job, and the nature of the replacement job as an indication of the likelihood of its being permanent.

8. We mention, as an example, one error which the Company stresses in its brief. The Company alleged striker Bruns had secured permanent employment elsewhere. A "quit slip" was offered, but it was executed on March 1, 1968, two months after the election. All parties agree that the challenges must be determined as of the date of the election. The Company alleged Bruns stated in the presence of witnesses that he intended to stay with his new employer, but no affidavits of this fact were supplied and the date of this "declaration" is omitted. The Director found that Bruns had obtained other work, but also found that Bruns had 20 years seniority at Duncan. The Director erroneously stated that Bruns was receiving a substantially lower rate of pay at his new job. In fact, the pay rate was substantially equivalent. However, judging from the Director's analysis as to other strikers, we have no doubt that, in view of the significance of twenty years of seniority, even without the pay factor, he would not have sustained the challenge.

9. The Company complains that a letter of February 27, 1968, from the Union to the strikers interfered with its gathering of evidence on the challenges. The letter warned strikers that if they wished to return to Duncan they should be careful of what they might say in any contact with the Duncan Personnel Office because "the Company may try to get you to admit that your present employment is 'permanent' or 'substantially equivalent' to your former job at Duncan Foundry. You should state only that, although presently employed, you wish to return to work for Duncan Foundry, if that is the case." (A. 224.) The Union was apparently trying to warn those who did intend to return to Duncan ("if that is the case") not to be misled into making damaging statements which would not reflect their true intention. We are inclined to conclude that there was nothing improper in the Union's letter, but we need not squarely decide that question be-

**B.**

The Company contends that it should have been granted a hearing in response to its offer to prove that the size of the bargaining unit had been permanently reduced to no more than 200 employees. The strength of that contention again depends on the nature of the "specific evidence" which it tendered to the Board. The question, of course, is whether the challenges were sufficient at the time the election was held.

■ Most of the Company's proffer to the Board consisted of argument and conclusory matter, rather than evidence. The Company did demonstrate that its volume of business had declined drastically during the strike, but we agree with the Board that it was up to the Company to make a concrete showing that a permanent change in the size of its business had occurred before the strike ended. We think the Regional Director's summary of this aspect of the case was proper. He said:

"Since the termination of the strike the Employer has increased its work force only by approximately 11 men from among those men who had participated in the strike, despite the fact that many more such individuals have applied for work. Applicants have been generally told that there were no openings for them at the times they applied.

"The Board has held that where elimination or consolidation of jobs due to streamlining of operations occurs with no additions to the present working force contemplated, there is a complete elimination of the jobs rendering the striking employees who no longer have jobs ineligible. Similarly,

where an employer no longer has the means of providing the jobs which were formerly filled by strikers because of the sale of machinery or subcontracting of work, and the Employer does not anticipate increasing the work force in the foreseeable future, former strikers not recalled have been found to be ineligible.

"In the instant case, however, the Employer's evidence does not support a conclusion that the jobs of strikers have been permanently eliminated, but only that during the course of the strike the Employer has suffered an overall reduction in business and production which is a normal and foreseeable result of a strike. The Employer lost orders because it operated with a reduced complement of employees and therefore could not meet normal production demands. It is only conjecture on the part of the Employer to contend that new orders will not be obtained and production will not return to a normal pre-strike level. There has been no fundamental change in the Employer's operations, no cessation of any segment of its business activities, no sale of equipment and no subcontracting of its functions. The Employer still retains the capacity to accommodate pre-strike levels of production and employment, which distinguishes the instant case from those described above.

■ "Therefore, the challenges to the ballots of all striking employees which are based on the contention that the striking employees had been permanently replaced and/or that their jobs had been eliminated are overruled." [10]

cause we think the Company's argument fails for another reason. The strike had been in progress for a year before the election was held. The letter was not written until two months after the election. The Company was aware all along that if it were to challenge voters in the election which almost certainly would eventually be held, it would need evidence to support its challenges. We conclude, therefore, that the Company had ample opportunity

to gather its evidence before the letter was sent and that it therefore cannot claim prejudice even if the letter was improper.

10. A. 262–263. The fact that *after* the strike the Company did not resume pre-strike levels of operation is not determinative. The decision on the challenges must be based on the evidence and probabilities at the time of the election. Thus, the motion filed January 22, 1971, and held for

We have carefully reviewed the other contentions advanced by the Company, but are satisfied that they have insufficient merit to warrant further discussion. We find it unnecessary to discuss the authorities on which the Company relies because our opinion is based on our review of the facts and circumstances of this case. Contrary to the Company's argument, sustaining the Regional Director's action on this record cannot be interpreted as a carte blanche to Regional Directors to decide election challenges without evidentiary hearings. As the cases discussed in the Company's brief indicate, in many situations a hearing may be essential to afford the parties due process of law. We conclude, however, that this is not such a case.

The petition for review is denied and the Board's cross-application for enforcement is granted.

determination with the case, which seeks a remand or leave to adduce additional evidence and which appends an affidavit

setting forth the number of employees for each month from February, 1968, through January, 1971, is denied.