NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WESTINGHOUSE ELECTRIC
CORPORATION,
Respondent.

No. 78-2573.

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1979.

Decided July 20, 1979.

---

Paul J. Spielberg, N.L.R.B., Washington, D. C., for petitioner.

Joel H. Kaplan, Chicago, Ill., for respondent.

Before SWYGERT, PELL and BAUER, Circuit Judges.

PELL, Circuit Judge.

This case is before the court upon the application of the National Labor Relations Board (Board) for enforcement of its Decision and Order issued against Westinghouse Electric Corp. (company), on June 14, 1978, and reported at 237 NLRB No. 191 (1978).

The company is engaged in the manufacture, distribution, and sale of electrical apparatus and related products at its plant in Bloomington, Indiana. Since 1958, the company has recognized and contractually bargained with Local Union No. 2031, International Brotherhood of Electrical Workers

(union) as representative of its production and maintenance employees at the Bloomington facility. At all material times, the union represented approximately 400 bargaining unit employees.

Under the parties' collective bargaining agreement, the company could schedule a plant shutdown during the calendar year. All employees entitled to vacation with pay were required to take one week concurrently with the shutdown. The agreement, likewise, obligated the company to negotiate the period of the shutdown with the union and designate the dates before January 1 of the year in which the vacation shutdown would occur. The parties agreed in 1976 that the vacation shutdown period for 1977 would last from June 27 (Monday) through July 1 (Friday).

Generally speaking under the contract an employee would be eligible for vacation with pay if he had accumulated at least one year's length of service. Pursuant to the agreement, the substantive right to vacation with pay vested only if the employee was on the "active roll" and had completed thirty days of continuous service at the end of the preceding calendar year. Qualified employees also were required to satisfy two other contractual eligibility requirements in order to receive vacation with pay. First, an employee was required to be on the active roll as of the time of his vacation; and second, he must have completed "at least thirty (30) days' continuous employment at the close of business on his last worked day immediately preceding the time of starting his vacation. . . ." The contract defined the term "active roll" as including those ". . . employees currently available for work except for [certain excused absences] but does not include . . those engaged in a work stoppage."

On June 12, 1977, approximately two weeks prior to the scheduled shutdown, all bargaining unit employees participated in a lawful strike over unresolved grievances which strike lasted until July 5.[1] During the course of the strike, company and union representatives met several times. The company manager told the union that the employees would not be paid unless the strike was over and they returned to work by June 24th. During the strike the company maintained a telephone answering service over which taped messages were played. In a message introduced on June 20, the company announced that if the strike were not settled by Friday, June 24, employees not at work on that day would be ineligible for their scheduled one week's vacation pay. Some forty employees who had been on strike returned to work by June 24 and these employees were paid on that date for the vacation shutdown which commenced on the following Monday.[2] All employees in the unit who remained on strike on June 24, 1977, were not paid their vacation pay on that day but instead at a later time in the year, at a time when the plant was in operation, took a vacation and were paid for the vacation. These employees, of course, lost one week's wages.

1. The contract did not provide for arbitration of unresolved grievances.

2. The stipulation at the hearing referred to "by" or "on or before" June 24th. It is clear that all forty had been away from work during the work stoppage but the record is not clear whether some returned to work only on the 24th or a few days earlier. For our purpose here, as the parties have in effect done, we will treat the return date as being on June 24th. The unfair labor practice complaint charged against the company was not based on a solicitation or inducement theory. While we would regard it as somewhat unrealistic to think that the employees who returned to work, and who did receive the one week's vacation pay at that time, were not aware of the company's announcement, because of the posture in which the case is presented to us, we do not treat the matter of the announcements as per se interfering with, restraining, or coercing employees in the exercise of their rights guaranteed by Section 7 of the Act. The matter of the announcements did appear in the union's charge but not in the general counsel's complaint. Before the Administrative Law Judge (ALJ), the general counsel stated that he was not asking for a finding of violation on the telephone messages in and of themselves. The company asserts that there was no finding that the company's actions were motivated by anti-union animus and the Board does not seem to take a contrary position.

We also note one additional factual matter which is not directly addressed either in the briefs or oral argument. The Board's brief states that the some three hundred and sixty employees were "required" to take the additional time off later in the year. The citations, however, for this proposition were to a stipulation that "after the strike ended all employees not paid their vacation prior to the shutdown took vacation time off before the end of the calendar year 1977, and were paid for this vacation time off," and to the ALJ's finding of facts which incorporated the stipulation and again referred to "took." From our examination of the record, however, it appears that if the employees had desired to receive the vacation pay for 1976 payable in 1977 they had no choice except to take time off. Thus in its brief the company states that "[w]hile it is true that the striking employees had a vested right to vacation pay in 1977, that payment was not due them until they took vacation time-off." Further, the company referred to what it characterized as universal recognition "that management has a substantial interest in requiring that employees take vacation time off from work for rest and relaxation." Finally on this matter we note a provision of the union contract reading as follows:

> It is the responsibility of the Company to see that all employees take their allotted vacation. Vacations must be taken within the vacation year, and they are not cumulative.

We therefore consider that the characterization "required" is proper.

The Board found, in agreement with the ALJ, that the company violated Sections 8(a)(1) and (3) of the Act by withholding their earned vacation pay from its striking employees on June 24, while granting vacation pay immediately to those employees who had abandoned the strike and returned to work, and by requiring them thereafter to forego a week of work in order to qualify for that pay. The Board's order requires the company to cease and desist from the unfair labor practice as found. In addition although the ALJ had enjoined the company from interfering with employees' Section 7 rights, "in any like or related manner," the Board modified this part of the ALJ's order and prohibited the company from violating Section 7 rights "in any other manner." Affirmatively the Board's order requires the company to make the striking employees whole for any loss of wages they may have suffered as a result of the company's failure to pay them vacation benefits on June 24. The parties apparently agree that the effect of this part of the order is to require payment of wages for the workweek missed when the vacation was later taken to be computed in the manner prescribed in *F. W. Woolworth Co.*, 90 NLRB 289 (1950), and *Florida Steel Corporation*, 231 NLRB 651 (1977). The company was also required to post appropriate notices and to make available necessary records for the purpose of computing the amount of back pay due.

The company, in opposition to the Board's application for enforcement contends that the challenged action did not constitute an unfair labor practice and that even if it did the remedy of ordering the payment of the additional week's pay was inappropriate, and finally that in the absence of findings of anti-union animus and/or extensive unfair labor practices the Board's cease and desist order was too broad.

The first two contentions of the company are interrelated, and we will consider those first. The sections of the Act found to have been violated are Section 8(a)(1), which makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 of the Act," including the right to engage in a lawful strike, and Section 8(a)(3), which makes it an unfair labor practice for an employer "by discrimination in regard to . . . any term or condition of employment . . . to discourage union membership in any labor organization." The Board relies upon *NLRB v. Great Dane Trailers*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), and its progeny in this circuit, *Flambeau Plastics Corp. v. NLRB*, 401 F.2d 128 (7th Cir. 1968), *cert. denied*, 393 U.S. 1019, 89 S.Ct.

625, 21 L.Ed.2d 563; *NLRB v. Duncan Foundry & Machine Works, Inc.*, 435 F.2d 612 (7th Cir. 1970); and *NLRB v. Knuth Bros.*, 584 F.2d 813 (7th Cir. 1978). The company contends that the Board's reliance upon this line of authorities is misplaced because in all of the cases the rights of striking employees to vacation pay was extinguished although vacation pay benefits were given to nonstrikers. Here, according to the company, there was a significant difference in that all employees, strikers and nonstrikers alike, received all of the vacation time-off and all vacation pay to which they were entitled in 1977 during the calendar year. "It is patently obvious, therefore," continues the company, "that the company did not discriminate in regard to terms or conditions of employment as striking employees merely had their vacations with pay deferred until they were once again on the 'Active Roll.'" The company in turn relies upon cases which it argues are applicable: *Texaco, Inc.*, 179 NLRB 989 (1969), *Detroit Edison Co.*, 206 NLRB 898 (1973), and *G. C. Murphy Co.*, 207 NLRB 579 (1973). The Board did not file a reply brief but in oral argument distinguished these cases on the basis that the company's practice toward all employees was consistent and equal, pointing out that in those cases vacations had been scheduled at a time when a strike had intervened and that the companies had been held to have properly deferred the vacation taking to a later time.

From our examination of the cases, we conclude that each of the parties is correct insofar as each contends that the cases are not directly applicable here, although there is language in *Duncan Foundry* which might seem to be directly applicable to the present case:

. . . the effect of the alleged active work rule is to deny strikers vacation benefits while granting such benefits to . . . strikers who returned before the end of the strike. It is discriminatory on its face and could adversely affect employees in the exercise of their right to strike.

435 F.2d at 618. We further conclude after examining the cases cited by the respective parties that each individual case will depend to some extent on its own factual situation viewed in the light of its own particular contractual language. Thus, in *Duncan Foundry* the result was in part at least based upon a provision in the contract that no employee should be entitled to vacation unless he was an employee on May 1. *Id.* In *Duncan Foundry* there was no question of employee status at the time of the strike.

The company contends that it was doing nothing more than complying with the terms of the contract and that this was a bargain struck by the union and the company which provided that if employees were on strike they did not get the vacation pay at the time of the vacation shutdown because they were not on the active roll as defined in the contract. It might have been a different case if some employees had never gone out on strike but had continued to report for work throughout the strike up to and including the last work day before the vacation shutdown period. Indeed the Board at oral argument came close to conceding that there would have been no proper claim by the nonreturning employees in such a case. This is not, however, the case which is before us.

The company's argument at this point is bifurcated, it contending on the one hand that it applied the contract virtually according to its term and it in essence had no choice as to giving the pay to the forty returning employees and, alternatively, that the requirement of at least thirty days continuous employment at the close of business on the last work day immediately preceding the time of starting vacation was properly waived by the company.

Turning first to the company's contention of compliance with the contract terms, the company places great significance on the word "his" in one of the two requirements for eligibility for vacation of "at least thirty (30) days' continuous employment at the close of business on his last work day immediately preceding the time of starting his

vacation." The gist of the company's argument at this point could be construed to be that a returning employee had worked more than thirty continuous days at the time he went on strike and that when he returned on Friday this was *his* compliance with thirty days of continuous employment. This is contrary to the testimony of the manager of personnel relations for the company who stated in response to questioning:

Now, they didn't have 30 days' continuous employment, did they?

A. No.

Q. So you made an exception in that situation. Is that what your testimony is?

A. Yes, and we offered to make the same exception to all the other employees if they returned to work by the 24th.

This testimony was referred to in the summary of the facts by the ALJ. Also, we note in the ALJ's decision, at n.9, a reference to the company's brief before the ALJ in which the company had stated "that the company was willing to waive the 30 day continuous employment requirement 'in an effort to settle the strike and to accommodate the union.'" This position at the initial hearing level would seem scarcely consistent with the present position that the payment was made to the forty employees in compliance with the contract.[3]

Even if we take the position that the interpretation of the contract by a responsible company official is not necessarily binding upon the legal effect of language in the contract, we cannot agree with the company's somewhat tortured argument on this point. There is no showing in the record that irrespective of whether the plant was not operating because of all of its production and maintenance workers being out on strike that the forty employees could not have continued to report for work and

thereby have been truly engaged in continuous employment up to the time of the vacation shutdown. The clear purpose of the not unusual requirement that for eligibility for vacation there must have been continuous employment for a specified period immediately prior to the starting of the vacation is to maximize availability of employees. The forty employees were not on the active roll of the company during the time they were on strike and their return on Friday simply does not qualify them as having been continuously employed for thirty days continuously immediately preceding the time of starting their vacation. Each returning employee was employed "at the close of business on his last worked day immediately preceding the time of starting his vacation," but to say that that was thirty days continuous employment in the absence of a showing such as a lockout on the part of the company tortures the plain intent and meaning of the contract. We decline to give it this reading.

We regard the company's argument on this first point as being not entirely clear and we may have misconceived it. An alternative construction on this phase of the company's argument is as follows. The strike began on June 12. It was undisputed that most, if not all, the strikers had thirty days continuous employment on June 11 as of the close of "*his* last worked day" prior to the strike, and also prior to the start of the vacation shutdown. Hence, the company argues, if a striking employee had abandoned the strike on Saturday or Sunday, June 25 or 26, he would have resumed his position on the "Active Roll" and would have worked thirty continuous days on his last worked day which would have been June 11. The company then contends, "the waiver that occurred, if any, was hardly of

---

**3.** Indeed, at one point in its brief in this court the company states that it is undisputed that it waived the 30 day continuous employment requirement. This statement was made in the context of an argument that all employees were treated equally because the company waived as to *all* strikers so that any person returning to work by June 24 would receive his vacation. We have noted and agreed with the company's

argument that this case was not processed as an inducement case but the company has failed to demonstrate what authority it had to take this unilateral action to deviate from the bargain which had been struck by the parties. The crucial fact for the present case, as we ultimately regard it, is not what the company offered to do as to all employees but what they did do as to a part of the striking employees.

such monumental proportions as to constitute an unfair labor practice." This was not what happened and, in view of the monetary impact on some three hundred and sixty striking employees, we regard this de minimis argument as bordering on being frivolous.

■ Having determined that the forty employees were not eligible under the contract for the payment of the vacation pay at the time they received it, we now turn to the question of whether paying those employees and not paying other employees who were still engaged in a work stoppage violated Sections 8(a)(1) and (3) of the Act, even though the striking employees at a subsequent time in the calendar year were given a week's vacation with pay. We conclude that there was such a violation. We find no support for the company in the trilogy of NLRB cases previously mentioned herein, *Texaco, Inc.*, *Detroit Edison Co.*, and *G. C. Murphy Co. Texaco* is of dubious value as an authority because the holding of the ALJ, affirmed by the Board, was that the strike was both unlawful and unprotected. Insofar as *Texaco* purported to deal with the deferral of vacation where the time of scheduled vacations occurred during a strike period, *Detroit Edison* later stated that as in *Texaco* the company had not taken anything away from the employee in question but had merely required him to postpone a vacation day. 206 NLRB at 899. In *G. C. Murphy*, the ALJ's decision, affirmed by the Board, pointed out that the only distinction between those who honored the picket line and were the objects of alleged discrimination under the complaint and those who were also engaged in such activity but were not covered by the complaint is the fortuity of when their scheduled vacations happened to fall. Otherwise both categories were similarly situated, for they both received time off with pay during the vacation year. The primary impact of the contractual policy fell equally on both groups and both groups refused to cross the picket line. The decision fell within the lawful implementation of a right acquired through the collective bargaining process. 207 NLRB at 583.

One essential difference between the trilogy of cases relied upon and the present case is that the company did not act as in *Murphy* "according to the procedure dictated by the terms of the existing collective bargaining agreement." *Id.* By its making an exception for the forty returning employees it deviated from the contractual requirement for continuous work.[4] The uniqueness of the present case lies in the fact that there was one week during the year when employees because of the plant shutdown were enabled to take their vacation, or at least one week of it, without losing the wages that would be lost if the vacation were taken during a normal working period.[5] In the trilogy of NLRB cases, it appears that whenever the vacation was to be taken it was to be taken at a time when normal working hours would be observed and so, as the Board stated in *Detroit Edison*, the employee was not losing anything but merely taking his vacation at a different time. In other words, he would have lost the pay for working whenever he took his vacation. We also note that one member of the Board panel in the present case was a member of the panel in both *Detroit Edison* and *G. C. Murphy* and that

---

4. The company in its brief in this court expresses difficulty in understanding why, if it was willing to waive one eligibility requirement, it was required to waive both eligibility requirements. If all of the striking employees had acceded to the company's willingness we presumably would not be concerned with the issues now before us, although if this had had the effect of breaking the strike, we no doubt would have another type of case arising out of the action. In any event, what we do have here is a disparate implementation of the willingness. The company, having taken action on an ex parte basis in violation of the contract, is not in a good position to insist upon choosing and picking the extent of its waiver.

5. We also note, but find no merit, in the company's reliance on past practice. The fact that previously the company had not made vacation payments to employees on strike during the strike has no materiality to the present case because other strikes had not coincided with the vacation shutdown period, a unique and crucial aspect of the present case.

one other member of the present panel was on the panel in *Texaco* and *Murphy* although dissenting from the result reached in *Murphy*.

Although *Great Dane Trailers* and its progeny are not directly on point because there the right to vacation was extinguished, we think that the reasoning of those cases is applicable here. In *Great Dane*, 388 U.S. at 32, 87 S.Ct. at 1797, the Court noting that the result of the company's refusal to pay vacation benefits to strikers was discrimination in its simplest form, stated:

> Some employees who met the conditions specified in the expired collective bargaining agreement were paid accrued benefits in the amount set forth in that agreement, while other employees who also met the conditions but who had engaged in protected concerted activity were denied such benefits. (Footnote omitted.)

■ It takes a simple paraphrase to note that in the present case some employees who did not meet the conditions of eligibility specified in the bargaining agreement received vacation benefits while other employees who also did not meet eligibility conditions but who had engaged in protected concerted activity were denied such benefits. We believe that in either case there can be no doubt that the discrimination was capable of discouraging membership in a labor organization within the meaning of the Act. *Id.* As in *Duncan Foundry, supra*, 435 F.2d at 618–19, the effect of the action here was to deny strikers vacation benefits while granting such benefits to strikers who returned before the end of the strike, and such action being discriminatory on its face and susceptible of adversely affecting employees in their exercise of the right to strike, the burden was on the company to establish that it was motivated by legitimate objectives. As in *Duncan*

*Foundry*, we find no showing of substantial legitimate justification for the action taken by the company in this case. We agree with the Board, therefore, that the company's conduct was "inherently destructive" of important employee rights and that the proof of an antiunion motivation was not required. We also, accordingly, agree that the company thereby engaged in unfair labor practices in violation of Sections 8(a)(1) and (3) of the Act.

■ This, however, does not settle the matter because the company also contends that even if its conduct was unlawful, the Board's order requiring that the company pay strikers an extra week's wages in addition to the vacation payments already made is "beyond all reason and cannot be enforced." The company argues citing *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979), that the rule of deference to the Board's choice of remedy does not constitute a blank check for arbitrary action. We agree with the company that in the present factual context, all employees received their vacation benefits for 1977 but by the manner in which it was handled there was disparate treatment between strikers and returning strikers because those who returned received the vacation without loss of a week's wages and those who did not return lost a week's wages. It is, of course, here again that we have the unique, somewhat fortuitous, circumstances that the strike occurred during the shutdown period. We agree with the Board's position, however, that because the strikers did lose a week's pay as a direct consequence of the company's unlawful conduct, in order to restore the *status quo ante* a make whole remedy is properly required in the circumstances.[6]

■ Finally the company contends that under the circumstances of this case the Board improperly entered an overbroad

---

**6.** At first blush, the payment order might seem to create a somewhat anomalous situation of disparity going the other way. Thus, those employees who returned to work received pay for all weeks worked later in the year but the nonreturning employees will receive the same pay for some week in which he did not work. This, however, is the usual situation in backpay orders, those receiving this pay having become entitled to it because of the unfair labor practice and not because of having worked for it.

cease and desist order. The ALJ in his proposed order against the company ordering it to cease and desist from certain activity included the following:

(b) In any like or related manner interfering with, restraining or coercing employees in the exercise of their right to self organization, to form, join, or assist the above-named or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purposes of collective bargaining or other mutual aid or protection, or to refrain from any' and all such activities.

The Board while affirming the decision of the ALJ amended paragraph 1(b) as follows:

(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of their rights guaranteed in Section 7 of the Act.

The Board does not contravene the company's statement that in the present factual context there is no evidence that its actions were motivated by an anti-union animus and that the record is barren of any evidence indicating a history of unfair labor practices on the part of the company. The company cites several cases from this circuit that absent these critical evidentiary factors there is no basis in the record for the Board's sweeping order prohibiting the violation of Section 7 of the Act "in any other manner." *See, e. g., Blount Brothers Corporation v. NLRB*, 571 F.2d 4 (7th Cir. 1978); and *NLRB v. Thompson Ramo Wooldridge Inc.*, 305 F.2d 807, 811 (7th Cir. 1962).

The Board at oral argument, while not conceding the correctness of the cases in this circuit, does not contend that the revised portion of the Board's order does not contravene authoritative precedent in this circuit. Accordingly, we hold that the portion of the cease and desist order and the accompanying notice to employees should be phrased in accordance with the original cease and desist order as entered by the ALJ if the Board's order is to be enforced.

For the reasons hereinbefore set out the Board's order is ordered enforced except as modified in the manner referred to hereinbefore in this opinion.