**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NATIONAL SEAL, DIVISION OF FEDERAL-MOGUL-BOWER BEARINGS, INC., Respondent.**

**No. 19054.**

United States Court of Appeals Ninth Circuit.

Nov. 6, 1964.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Marion Griffin, Attys., N. L. R. B., Washington, D. C., for petitioner.

Roderick M. Hills, Munger, Tolles, Hills & Olson, Los Angeles, Cal., for respondent.

Before BARNES and JERTBERG, Circuit Judges, and McNICHOLS, District Judge.

McNICHOLS, District Judge.

The National Labor Relations Board has petitioned this Court for enforcement of its order issued March 21, 1963 against the Respondent, National Seal, Division of Federal-Mogul-Bower Bearings, Inc. (141 NLRB No. 17).

There is no controversy on the facts as the case was submitted to the Board entirely upon stipulation.

National Seal, Respondent, is engaged in the manufacture of automobile parts

in its plant at Downey, California. For a number of years it engaged in collective bargaining with Local 171, United Rubber, Cork, Linoleum and Plastic Workers of America, AFL-CIO (hereinafter referred to as the "Union").

The agreement between the company and the Union expressly provided for a sixty (60) day probationary period for all new employees, who, during such probationary period, were not to be regarded as regular employees and who, in case of discharge, had no recourse to the grievance procedure. At the end of the sixty-day probationary period, names of such employees would either be placed on the regular payroll or their names would be removed from the payroll.

The Company had adopted a practice whereby such probationary period was required to be completed without interruption. If the probationary period were interrupted for any reason such employees were terminated.

In September, 1961, the Company and Union representatives began negotiations pursuant to their agreement which provided for a termination of the same unless agreement was reached by October 1, 1961. Agreement was not so reached and on that date a strike was called. The entire bargaining unit of some 230 employees participated. Upon the commencement of the strike the probationary employees (we are only concerned with three such employees here) received the following notification by the Company.

"Since you did not complete your probationary period prior to the strike you are being terminated.

"We will be pleased to consider your application for future employment at any time."

It was stipulated that the Company's sole motive in terminating these proba-tionary employees was that the Company wanted all probationary periods to be continuous and unbroken. This rule was of long standing and had been rigidly enforced prior to the strike.

The strike was settled on November 21, 1961 and the Company and Union entered into a settlement agreement which included provisions for the return to work of the strikers. No provision was made for the return to work of the probationary employees, and none of the terminated probationary employees requested reinstatement.

Thereafter the Union filed unfair labor practice charges against the Company alleging that the Company had discriminated against the Union in reinstating the strikers in several particulars. It is interesting to note that no mention was originally made of the Company's termination of the probationary employees with whom we are here concerned. Subsequently the charges were amended to additionally allege that the Company's termination of the probationary employees violated the N.L.R.A. Eventually all other charges were dismissed and the sole issue before the Board dealt with the termination of the probationary employees.

By its decision and order the Board ruled that the Company, in applying the probationary rule when the probationary period was broken by reason of strike activity, had deprived the probationary employees of the rights guaranteed by Sec. 7 of the Act and had violated Section 8(a) (1) and (3) of the Act.[1] The Board ordered the Company to cease and desist from discriminating against its employees for engaging in a lawful economic strike and from interfering with, restraining or coercing its employees in

[1] "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor or-

the exercise of rights guaranteed by the Act, and the Company was further required to reinstate the probationary employees in question with back pay.

In making its Findings, Decision and Order the Board did not consider the question of the motivation of the employer, nor the business end to be served by the probation rule. The Board appears to have adopted as a per se rule the holding that employers may not apply otherwise lawful probationary rules governing the terms of employment to economic strikers if the effect of the rule in any way tends to discourage the strike. In making this determination, the Board announced that it deemed its decision in Quality Casting Co., 139 NLRB No. 66, as controlling. In the interim period, the Court of Appeals of the Sixth Circuit has set aside the order of the NLRB in Quality Casting for lack of evidence to support the determination that the employer was motivated by a desire to discriminate against the striking employees.[2]

On May 13, 1963, subsequent to the Order of the Board herein under consideration, the U. S. Supreme Court decided the *Erie Resistor* case.[3] We believe that *Erie Resistor* clarifies the rules to be applied to the question presented here. In *Erie* the employer granted seniority credits of twenty years to employees hired to replace strikers. The employer contended that there was a legitimate business purpose involved. It claimed that qualified production employees were unobtainable without such seniority bonus inducement because of the strike status of the firm.

After stating the contentions of the parties the Supreme Court set out what it termed "The teaching of the Court's prior cases dealing with this problem" in the following language:[4]

"* * * But, as often happens, the employer may counter by claiming that his actions were taken in the pursuit of legitimate business ends and that his dominant purpose was not to discriminate or to invade union rights but to accomplish business objectives acceptable under the Act. Nevertheless, his conduct does speak for itself—it is discriminatory and it does discourage union membership and whatever the claimed overriding justification may be, it carries with it unavoidable consequences which the employer not only foresaw but which he must have intended. *As is not uncommon in human experience, such situations present a complex of motives and preferring one motive to another is in reality the far more delicate task, reflected in part in decisions of this Court, of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct.*" (Emphasis supplied.)

Later in the same opinion the Court says:[5]

"* * * We think the Board was entitled to treat this case as involving conduct which carried its own

ganization as a condition of employment as authorized in section 8(a) (3)."

"Sec. 8(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

* * * * * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to en-

courage or discourage membership in any labor organization;"

2. Quality Casting Co. v. NLRB (6th Cir., 1963) 325 F.2d 36.

3. NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308.

4. *Erie, supra*, 373 U.S. 221 at 228–229, 83 S.Ct. at 1145–1146.

5. *Erie, supra*, 373 U.S. 221 at 231–232, 83 S.Ct. at 1147.

indicia of intent and which is barred by the Act *unless saved from illegality by an overriding business purpose justifying the invasion of union rights.*" (Emphasis supplied.)

And yet again, in the same opinion, the Court again indicated the necessity for balancing the equities in the following language:[6]

"Accordingly, in view of the deference paid the strike weapon by the federal labor laws and the devastating consequences upon it which the Board found was and would be precipitated by respondent's inherently discriminatory superseniority plan, we cannot say the Board erred in *the balance which it* struck here." (Emphasis supplied).

As we apprehend the effect of the *Erie case*, the Board (and this Court upon petition for enforcement of a Board Order) is bound to firstly consider the effect of the employer's rule or conduct under attack on the rights of the employee to strike and secondly the claimed business purpose of the employer in promulgating the rule or adopting the course of conduct in issue. A balance in favor of one side or the other should then be struck. If the question be a close one, then it would seem that evidence concerning the motivation of the employer would become an important element.

" * * * The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." National Labor Relations Board v. Truck Drivers Local Union, etc., 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676.

In the instant case, the matter was submitted to the Board on the stipulated written record. No good purpose would be served by returning the matter to the Board for further consideration in light of the *Erie case*, since we feel that the record, as a matter of law, will not support a finding against the employer.

In evaluating the admitted evidentiary facts for the purpose of determining the issue, we have considered the following situation to be established:

The provision for a probationary period for new employees is not unusual or unique. The provision in question was of long standing, had been rigidly enforced, was fully accepted by the Union and had been incorporated into the collective bargaining agreement between the Union and the employer. It had a reasonable and practical purpose and was reasonable in duration. The rule applied only to the newly hired employees who, by the terms of hiring, were not regarded as regular employees during the probationary period. In case of discharge of a probationer, he had no recourse to the grievance procedure and was only placed on the regular payroll and seniority list upon completing the probationary period to the satisfaction of the employer. The Union itself, apparently, did not consider the act of the employer in terminating the probationers an unfair labor practice, since the original petition did not mention this termination.

On this state of facts it is obvious that the attitude and motivation of the employer become important in determining whether or not the employer is guilty of discriminatory, coercive or anti-union conduct as proscribed by the Act. The

6. *Erie, supra*, 373 U.S. 221 at 235, 83 S.Ct. at 1149.

parties stipulated that the employer was not so motivated, and such stipulation is controlling. The record, considered as a whole, is barren of substantial evidence to sustain the Board's finding of unfair labor practices by the respondent company.

For these reasons the petition for enforcement of the Order of the Board is denied and the Order set aside.