**SYSTEM COUNCIL T–4, comprised of Local Unions 134, 165, 315, 336 and 399 of the International Brotherhood of Electrical Workers AFL–CIO, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 18161.**

United States Court of Appeals, Seventh Circuit.

July 19, 1971.

Rehearing Denied Aug. 11, 1971.

Robert E. Fitzgerald, Jr., Chicago, Ill., Anna R. Lavin, Chicago, Ill., for petitioner.

Gordon W. Winks, Henry E. Seyfarth, Chicago, Ill. (Intervenor), Rody P. Biggert, Edward W. Bergmann, Daniel L. Hebert, Chicago, Ill., Attys. for Illinois Bell Telephone Co.; Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Jack Weiner, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, William F. Wachter, Patricia Worthy, Attys., National Labor Relations Board, for respondent.

Before SWYGERT, Chief Judge, STEVENS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This is a petition to review and set aside an NLRB order[1] dismissing a complaint issued after unfair labor charges by System Council T–4 ("Union") against the Illinois Bell Telephone Company. We deny the petition.

I

The Union first charges the Company with a violation of Section 8(a) (1) of the National Labor Relations Act.[2] Approximately 11,800 employees in units represented by the Union went out on strike on May 8, 1968, in support of economic demands during contract negotiations. On June 4, the Company mailed to its employees this document, entitled "Important Message to All Employees":

If you have been off the job on an unpaid absence, you should know it is

---

1. The Board's order is reported at 179 NLRB No. 119 (1969).

2. 29 U.S.C. § 158(a) states: "It shall be an unfair labor practice for an employer

—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title * * *."

a long-standing Company practice to adjust an employee's net credited service date whenever the number of unpaid days of absence exceeds 30 consecutive days. (Service dates are important in computing such things as vacation allowances, benefits, pension dates, and other items.)

If any employee who has not been reporting for work because of strikes does report for work by June 6, 1968, no adjustment in the service date will be made. But under this practice, any employee who has been absent because of strikes and who does not report for work by June 6 will have his service date adjusted by the number of unpaid consecutive days absent in excess of 30.

All unions representing Illinois Bell employees have been reminded of this practice and advised that this information is being distributed to all employees.

■ The trial examiner, whose findings were adopted by the Board, found that under the parties' collective bargaining agreement and practice the "net credited service" referred to in the message determines length of vacations and entitlement to pensions, sick benefits, termination pay, and telephone concessions. Seniority, on the other hand, affects choice of vacation time, promotion eligibility, choice of hours, and order of layoff and recall. The Union concedes that the Company never did advance the seniority date of any striker. But the Union alleges that the June 4 message, by warning of an adjustment in the net credited service date, contained a threat to affect the strikers' seniority. Its argument is based on the fact that, prior to May 8, an employee's net credited service date usually coincided with his seniority date. A threat to halt accumulation of seniority during the remainder of the strike, the Union states correctly, would restrain employees in violation of Section 8(a) (1). *See* NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct.

1139, 10 L.Ed.2d 308 (1963); Swarco, Inc. v. NLRB, 303 F.2d 668, 672 (6th Cir. 1962), cert. denied, 373 U.S. 931, 83 S.Ct. 1533, 10 L.Ed.2d 689 (1963).

■ In deciding that the June 4 letter did not threaten loss of seniority, the trial examiner relied primarily on the language of the message, which mentions only net credited service and not seniority. He noted that the letter accurately stated which benefits would be affected by a change in service date. We agree with the examiner's construction of the letter and believe that the following facts cited by him support his conclusion:

(1) Personnel records were available for employees to check for variances between seniority and service dates. (2) Later in the strike, the Company made clear its policy not to adjust seniority dates and offered to incorporate an assurance to that effect in the new collective bargaining agreement. (3) There was no evidence that the letter had any impact on the effectiveness of the strike. (4) The Union could have clarified the significance of the letter if its members had been confused; it did not attempt to do so. The Union points to the paucity of proof that the Company's practice as set forth in the message was in fact "long-standing," and to the fact that the Company had never before communicated its practice to its employees, but these faults are easily explained—no strike against Illinois Bell had ever lasted more than 30 days. There is substantial evidence in the record to support the Board's finding. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962).

■ We therefore conclude that the June 4 message did not threaten the strikers with loss of seniority. Of course it did tell the strikers that their net credited service dates would be adjusted if they remained on strike for more than 30 consecutive days. But

since the adjustment itself was lawful, as we hold below, the warning of intent to make the adjustment does not violate Section 8(a) (1). Kansas Milling Co. v. NLRB, 185 F.2d 413, 420 (10th Cir. 1950).

## II

The Union's second charge is that the Company, in moving ahead the strikers' net credited service dates, violated Section 8(a) (3)[3] by discriminating against those employees who remained on strike more than 30 consecutive days.

Before reaching the merits of this charge, we must consider the Company's contention that the Board should not have entertained the 8(a) (3) charge because it was not stated plainly in the complaint.[4] The complaint alleged that the Company denied service credit for the period of the strike after June 6 (para. V), and that such act discriminated against its employees in violation of Section 8(a) (3) (para. IX). We believe the complaint was broad enough to encompass the Union's charge of discrimination in the adjustment of the service date. See Frito Co., Western Division v. NLRB, 330 F.2d 458 (9th Cir. 1964). Thus the substantive issue is properly before us.

The Union's argument begins with General Electric Co., 80 NLRB 510 (1948), which held that an employer could not suspend the accumulation of seniority during a strike, but could halt the accrual of vacation and pension benefits. The Board reasoned that, because vacation pay and pensions are a form of deferred benefits,[5] and because an employer is not required to remunerate strikers for work not performed, denial of such benefits does not discriminate against the strikers. Under General Electric, the adjustment of the net credited service date does not violate Section 8(a) (3).

The Union contends that subsequent Supreme Court cases undermine the rationale of General Electric, so that whenever an employer discriminates against any employee rights, he must establish that his motive was not anti-union. See NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); NLRB v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967).

A review of "fringe benefits" cases since General Electric shows that there are two major categories of benefits an employer may not withhold from striking employees under Section 8(a) (3). The first category includes any benefit which will give a nonstriking employee a preferred position over a striker on a long-term basis. These benefits are not in the nature of compensation for work performed; they are systems which give one employee priority over another in choosing hours or vacation times, or in setting an order for layoffs or promotions. Examples of these cases are NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963) (giving "super-seniority" to replacements and returning strikers as insurance against future layoffs); NLRB v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967) (hiring new employees when strikers were available for reinstatement); NLRB v. Duncan Foundry and Machine Works, Inc., 435 F.2d 612 (7th Cir. 1970) (rehiring strikers as "temporary" employees).

---

3. 29 U.S.C. § 158(a) states: "It shall be an unfair labor practice for an employer— * * * (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

4. General counsel for the NLRB seems to have abandoned the 8(a) (3) charge during the hearing, but the Union continued to press it.

5. Inland Steel Co. v. NLRB, 170 F.2d 247 (7th Cir. 1948), cert. denied, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949).

The other category of benefits an employer may not deny consists of any rights earned by the employee before the strike began. Withholding accrued benefits from strikers is conduct "inherently destructive" of employee rights and is an unfair labor practice unless the employer can prove a legitimate business purpose. NLRB v. Great Dane Trailer, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); NLRB v. Duncan Foundry and Machine Works, Inc., 435 F.2d 612 (7th Cir. 1970) (denying accrued vacation payments in both cases); Tex-Tan Welhausen Co. v. NLRB, 419 F.2d 1265 (5th Cir. 1969), vacated on other grounds, 397 U.S. 819, 90 S.Ct. 1516, 25 L.Ed.2d 805 (1970) (denying all vacation benefits because employees were not at work on December 31 or were absent more than 280 hours, where plan called for percentage payment according to annual salary).[6]

Conduct outside these two categories has never been held to amount to the sort of discrimination condemned in Section 8(a) (3). In Tex-Tan Welhausen Co. v. NLRB, *supra,* the company was allowed to compute vacation pay as a percentage of annual salary, thus reducing the benefit in proportion to the amount of strike time. The Board in Mooney Aircraft, Inc., 148 NLRB 1057 (1964), *enforced* 366 F.2d 809 (5th Cir. 1966), found no discrimination where the company, which required one year of work for vacation eligibility, refused to pay vacation benefits to strikers who had not worked a full year when the strike began. Health insurance premiums were called deferred benefits in Ace Tank and Heater Co., 167 NLRB 663

(1967). The employer was not required to make premium payments during the strike, but was forced to pay medical expenses incurred after the uninsured striker returned to work.

In Kimberly-Clark Corp., 171 NLRB No. 82 (1968), the Board adopted the thorough analysis of *Great Dane* by the trial examiner, who stated, " * * * I do not regard the decision of the Supreme Court in *Great Dane Trailers* * * * as precluding reliance on the often stated axiom that an employer need not remunerate strikers for work not performed." 171 NLRB No. 82 at 13. He found no discrimination in the company's denial of "service credits" (which served a purpose similar to Illinois Bell's net credited service) during the period of the strike.[7]

We believe the Supreme Court in *Great Dane* and *Fleetwood Trailer* did not intend to overrule *General Electric*; we reaffirm the validity of its distinction between seniority (and the benefits traditionally dependent upon it) and benefits related to work performed. Because the benefits affected by the change in the net credited service dates clearly fall into the latter classification, we find there has been no discrimination to activate the employer-burden rule of *Great Dane*. An employer may not prefer a nonstriking employee over a striker on a seniority list, but a company need not compensate a striker—with wages or deferred benefits—for work not performed.

The Union's petition to set aside the NLRB order is denied.

---

6. The fact that the employees were out on an unfair labor practices strike was also a deciding factor in the court's finding of discrimination.

7. In *Kimberly-Clark* the examiner mentions a complaint (abandoned by the union during grievance procedures) which is also present in our case: An employee who was hired—for example—in December 1958 and was on strike for five months would have his net credited service date moved forward to March 1959. Instead of being eligible for three weeks' vacation pay in 1968, he would not be eligible until 1969. We consider this result a "comparatively slight" harm to employee rights which the Supreme Court condoned in *Great Dane*. 388 U.S. at 34, 87 S.Ct. 1792.