**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**JEMCO, INC., Respondent.**

**No. 71–1837.**

United States Court of Appeals,
Sixth Circuit.

Aug. 15, 1972.

---

Corinna Lothar Metcalf, N.L.R.B., Washington, D. C., for petitioner; Mar-

cel Mallet-Prevost, Asst. Gen. Counsel, Robert A. Giannasi, N.L.R.B., Washington, D. C., Jerome H. Brooks, Director Region 7, N.L.R.B., Detroit, Mich., on brief.

Craig A. Miller, Gemrich, Moser, Dombrowski, Bowser & Garvey, Kalamazoo, Mich., for respondent; Herbert O. Johnson, President JEMCO, Inc., on brief.

Before CELEBREZZE and PECK, Circuit Judges, and RUBIN,* District Judge.

CELEBREZZE, Circuit Judge.

This case is before us on the petition of the National Labor Relations Board (hereinafter the Board) for enforcement of its order entered against Respondent, Jemco, Inc. (hereinafter the Company), on April 28, 1971, prescribing certain prohibitive and affirmative relief with respect to the Company's denial of vacation pay to its striking employees. The Board found that denial to be in violation of Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1) and 158(a) (3). The Board's decision and order are reported in 190 NLRB No. 36, 1971 CCH NLRB Decs. ¶ 22,983, at 29,738.

The Company is a Michigan corporation engaged in the business of precision machining in the city of Buchanan, Michigan. The United Steelworkers of America, AFL–CIO, (hereinafter the Union) has represented the Company's production and maintenance employees at all times since the Company purchased the business some 5 years prior to the present dispute. There had been no strikes at the Company prior to that involved in the present dispute.

In 1969 the Company and the Union entered into a 3-year collective bargaining agreement, one provision of which provided for a wage reopener on 60 days' notice prior to May 1, 1970. Exercising this option, the Union reopened the contract. When no agreement had been reached by May 1, 1970,[1] the Union called a strike which remained in effect at the date of the Trial Examiner's hearing on December 10. All 14 of the Company's production and maintenance employees struck, although it appears from the record (and the parties agree) that one employee returned to work for a brief period.

Early in the strike the Company sought and obtained an injunction in a state court against certain picket line activity. The Company also filed a damage suit against the Union, which had not been resolved at the time of the Trial Examiner's hearing.

On July 3, Union Representative Halstead wrote to the Company's president, Mr. Johnson, requesting that the Company pay vacation monies to the striking employees who qualified for those benefits under the 1969 contract. In a reply letter, Mr. Johnson refused to pay these vacation benefits on the ground that the Company was not legally obligated to do so.

At a negotiating session held before a state mediator on August 10, Mr. Johnson stated that the costs to the Company for legal action necessary to stop unlawful picket line activity amounted to $1200 [2] and that he was prepared to negotiate vacation pay against these costs. The dispute over vacation benefits remained unresolved after a meeting on October 27, and the Union subsequently filed the present unfair labor practice charge.[3]

After conducting a full hearing on the charge, the Trial Examiner found that

---

* The Honorable Carl B. Rubin, United States District Judge for the Southern District of Ohio, sitting by designation.

1. Unless otherwise indicated, all dates hereafter refer to 1970.

2. At a later negotiating session, Mr. Johnson reduced this figure to $1100.

3. The complaint asserted as an additional unfair labor practice the Company's discriminatory discharge of probationary employees. The Trial Examiner, however, found that claim to be without merit, and dismissed that aspect of the complaint.

the Company's refusal to pay vacation benefits to the employees was coercive and discriminatory under Sections 8(a)(1) and 8(a)(3) and that the Company had failed to meet its resulting burden of showing that there existed "legitimate and substantial business justifications for the conduct." NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967). The Board adopted the findings and recommended order [4] of the Trial Examiner. That order requires the Company to cease and desist its denial of vacation pay (and any other coercive or discriminatory conduct) and further requires that vacation benefits be paid to qualified employees.

In NLRB v. Great Dane Trailers, Inc., *supra*, which served as the basis for the Trial Examiner's decision, the Supreme Court imposed the following burden on an employer:

> "[O]nce it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives . . . ."
>
> 388 U.S. at 34, 87 S.Ct. at 1798.[5]

▇ We find no merit in the Company's attempt to remove itself from the burden prescribed in *Great Dane* by arguing that the Board failed to prove that the Company engaged in *discriminatory conduct* which adversely affected employee rights. The Company asserts that there could be no finding of discrimination when all employees were treated alike under the Company's refusal to pay vacation benefits. This argument ignores the fact that all employee's who otherwise qualified for vacation pay engaged in a protected, concerted activity by going on strike.[6] As the Supreme Court observed in NLRB v. Erie Resistor Corp., 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963),

> "[u]nder § 8(a)(3), it is unlawful for an employer by discrimination in terms of employment to discourage 'membership in any labor organization,' which includes discouraging participation in concerted activities, Radio Officers Union of Commercial Telegraphers Union, A.F.L. v. National Labor Relations Board, 347 U.S. 17, 39–40, 74 S.Ct. 323, 335, 98 L.Ed. 455, such as a legitimate strike. National Labor Relations Board v. Wheeling Pipe Line, Inc., 8 Cir., 229 F.2d 391; Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 114 F.2d 820."

*See also* NLRB v. Great Dane Trailers, Inc., *supra*, 388 U.S. at 32, 87 S.Ct. 1792.

---

4. The Board modified the Trial Examiner's recommended order only with respect to the date on which eligibility for vacation pay shall be determined. Whereas the Trial Examiner's recommended order required the Company to pay vacation benefits due on or after June 1, the Board's modified order requires payment of these benefits which were due on or after July 1, with interest from that date.

5. The *Great Dane* opinion contains language respecting the Board's burden of proving an antiunion motive after the employer has come forward with evidence of legitimate and substantial business justifications for conduct which has a "comparatively slight" adverse effect on employee rights, and the absence of such a burden upon the Board if the employer's conduct was "inherently destructive" of important employee rights. 388 U.S. at 34, 87 S.Ct. 1792. This language, however, should not be confused with the actual holding of the *Great Dane* case, as set forth in the text. *See* 388 U.S. at 34, 87 S.Ct. 1792 (stating that the Court found it unnecessary to decide the degree to which the challenged conduct in *Great Dane* adversely affected employee rights, since the company had failed to come forth with evidence of legitimate motives for its discriminatory conduct).

6. The Company emphasizes that one employee who abandoned the strike and returned to work for a short time was denied vacation pay along with the other employees who remained on strike. The record does not establish that this employee was denied vacation, but even if that was the case, it would not detract from the fact that all employees initially engaged in protected activity by going on strike.

Although we are not referred to, nor do we find, any cases involving Section 8(a) (3) discrimination where all employees alike were denied an employment benefit, we do not believe that unequal treatment of different classes of employees is a prerequisite to finding a Section 8(a) (3) violation where all employees engaged in a concerted activity.[7] The interpretation of Section 8(a) (3) which the Company urges us to adopt would lead to the somewhat absurd result that an employer could never be found in violation of that Section so long as he was careful to treat all employees alike, no matter how destructive of employee rights his conduct may be. The Section 8(a) (3) discrimination in the present case lies in the employment benefit afforded to all employees prior to their engaging in a concerted activity and the benefit which was denied to all employees after they engaged in such an activity.

We conclude that the Board could and did properly find that the Company's denial of vacation pay to all employees in the wake of their first strike in the history of the Company was "discriminatory conduct which could have adversely affected employee rights to *some* extent," when vacation benefits had been paid every year prior to the strike.[8] The burden was therefore upon the Company to "establish that [it] was motivated by legitimate objectives" in denying vacation benefits to the striking employees.

The Company attempts to justify its denial of the vacation pay by asserting that it had no legal obligation under the contract to pay the vacation benefits prescribed therein. In support of this position, the Company relies upon the following provisions of the contract: 1) Article XXII, Section 2,[9] which provided that all obligations under the contract were to terminate when the parties were unable to agree upon terms for continuation of the contract by May 1, after the contract had been reopened for wage negotiations; and 2) Article XVI, Section

7. It is noteworthy that our determination that the Board properly applied Section 8(a) (3) in the present case is not a prerequisite to our enforcement of the affirmative relief and the portion of the prohibitive remedy respecting the Company's Section 8(a) (1) conduct, as required under the Board's order. We believe, as did the Court of Appeals for the Fifth Circuit in Tex Tan Welhausen Co. v. NLRB, 419 F.2d 1265, 1271 (5th Cir. 1969), vacated on other grounds, 397 U.S. 819, 90 S.Ct. 1516, 25 L.Ed.2d 805 (1970), modified on other grounds, 434 F.2d 405, that the burden on the employer prescribed in *Great Dane* arises once it is established that the employer engaged in conduct which adversely affected employee rights, regardless of whether that conduct was discriminatory under Section 8(a) (3) or merely coercive or restraining under Section 8(a) (1).

8. The Board's finding that the Company's denial of vacation benefits was discriminatory conduct within the terms of *Great Dane* is in no way negated by the Company's contention that vacation benefits were paid in prior years under the terms of an operative contract, whereas the contract had assertedly terminated prior to

the denial of vacation benefits in 1970. The contract provisions upon which the Company relies to justify its denial of vacation benefits must be taken simply as the Company's attempt to meet its burden of showing that its discriminatory conduct was motivated by legitimate and substantial business objectives. The Company's contractual defense, however meritorious it may be, does not detract from the Board's initial finding that the Company's conduct was discriminatory.

9. "Article XXII, Section 2: The foregoing notwithstanding, either party hereto *may elect to reopen this Agreement* for the purpose of negotiating changes in the wage rates in Exhibit "A" hereof by notification to the other in writing at least sixty (60) calendar days prior to April 30, 1970, and/or April 30, 1971. In the event that the contract is reopened in accordance with this Section and the parties are unable to agree upon the terms for continuation of this Agreement, then effective May 1, 1970, and/or May 1, 1971, as the case may be, all of the terms and conditions set forth in this Agreement shall cease to have effect and neither party shall be bound thereby."

2,[10] which provided *inter alia* that vacations were not to be considered a "vested interest."

The Trial Examiner, however, found that apart from the question of the Company's legal obligation under the contract to pay the vacation benefits, the Company had failed to meet its burden under *Great Dane*. The Trial Examiner and the Board thus declined to interpret the relevant provisions of the contract.[11] The question before us, therefore, is whether there is substantial evidence to support the Board's findings even if we assume that the contractual provisions which the Company raises as a defense support the Company's contention that it had no legal obligation to pay the vacation benefits.

At the hearing before the Trial Examiner, the Company's president, Mr. Johnson, consistently asserted that the Company was not legally obligated to pay vacation benefits but that vacation pay was a negotiable item against which the Company would set off its legal expenses incurred in obtaining the injunction against unlawful picket line activity: "I have used this argument in every session that we have had; that my costs— legal costs, because of their unlawful acts on the picket line—are [the] union's expense, and I was negotiating those costs against the vacation pay."

Mr. Johnson, however, never asserted that the contract was void nor that the vacation benefits would not be paid. Rather, he simply asserted that the Company was not automatically obligated to pay the vacation benefits and it could "negotiate [its] way out of it." Mr. Johnson always indicated his intent to pay the vacation benefits, but only after the Company was "made whole" for its legal costs. He testified that the Company would pay the vacation benefits (presumably in full) if it was successful in its damage suit against the Union.

At the negotiating sessions prior to the filing of the present unfair labor charge, the Union thus was not met with a simple denial of vacation benefits based on the above contractual provisions. Rather, the Company consistently asserted its intent to effectuate a set off of its legal costs prior to the payment of those benefits. In view of this evidence of the Company's position respecting the vacation pay, we find that the Trial Examiner correctly determined that the real issue before him was not whether the Company had a legal obligation under the contract to pay the vacation benefits, but rather the question of whether the Company's attempt to set off its legal costs against vacation monies which had otherwise accrued under the contract constituted a legitimate objective so as to satisfy the Company's burden under *Great Dane*.

10. After setting forth the number of weeks of vacation and the percentage of annual earnings to which employees with specified years of seniority would be entitled as vacation benefits. Article XVI, Section 2, provided as follows:

"To qualify for a vacation and vacation pay the employee must be in the active employ of the company as of June 30 of the year in which the vacation is scheduled and must have worked at least 1,200 hours during the year. In no case shall vacations be considered a vested interest."

11. Notwithstanding the provisions of Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, it is now clear that the Board has jurisdiction to interpret the relevant provisions of a collective bargaining agreement when they are raised as a defense to an unfair labor practice charge and such interpretation is necessary for a resolution of the charge. *See* NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 30–31 n. 7, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). In the present case, however, we believe the Trial Examiner and the Board properly declined to interpret the relevant provisions of the contract upon their finding that the evidence supported the unfair labor practice totally apart from the question of the Company's legal obligation under the contract.

We find substantial evidence to support the Trial Examiner's conclusion that the Company's attempt to set off its legal costs against the employees' vacation pay did not constitute a legitimate objective as required under *Great Dane*. As noted by the Trial Examiner, the Company failed to establish any legal basis for the proposition that the striking employees could be held personally liable for any such legal costs. Indeed, the Company's damage suit in the state court was brought against the Union to recover monies from its treasury for the Company's legal costs and other expenses arising from the allegedly unlawful picket line activities. Nonetheless, Mr. Johnson attempted to justify the denial of vacation benefits from the employees personally as an alternate method of recovering the same legal costs.

Moreover, although Mr. Johnson at one point asserted that all employees who were entitled to vacation pay were participants in the acts which caused the legal expenses, at another point he acknowledged that some of the fourteen employees had "dropped off" from the picket line activity. Mr. Johnson further stated that his information as to who were the actual participants had come from telephone calls rather than from personal observation. He nonetheless asserted the Company's legal costs as a justification for denying vacation pay to all employees.

We thus find that apart from the question of the Company's legal obligation to pay the vacation benefits under the contract, there is substantial evidence on the record as a whole to support the Board's conclusion that the Company's attempt to set off the above legal costs did not constitute a legitimate and substantial business justification for its denial of those benefits. In view of this evidence supporting the Board's determination that the Company had failed to meet its burden under *Great Dane*, the Board could properly conclude that the Company had violated Sections 8(a)(1) and 8(a)(3) by denying vacation pay to its qualified employees.

We therefore enforce the Board's order.