KANSAS CITY POWER & LIGHT COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

I. B. E. W. Locals 412, 1464, and 1613, Intervenor-Respondent.

No. 79–1735.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1980.

Decided Feb. 4, 1981.

Stanley E. Craven, David D. Gatchell, Spencer, Fane, Britt & Browne, Kansas City, Mo., for petitioner Kansas City Power & Light Co.

William A. Jolley, John P. Hurley, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo., for parties respondent I. B. E. W. Locals 412, 1464 and 1613.

Janet C. McCaa, Washington, D. C., Penny Pilzer, Law Clerk, for N. L. R. B.

Before HENLEY and McMILLIAN, Circuit Judges, and HARPER,* Senior District Judge.

McMILLIAN, Circuit Judge.

This action is before the court pursuant to § 10(e), (f) of the National Labor Rela-

---

* The Honorable Roy W. Harper, United States Senior District Judge for the Eastern District of Missouri, sitting by designation.

tions Act, 29 U.S.C. § 160(e), (f) (hereinafter the Act), authorizing judicial review of final orders of the National Labor Relations Board (hereinafter the Board). Kansas City Power & Light Co. (hereinafter the employer) petitions for review of the final order of the Board in *Kansas City Power & Light Co.*, 244 N.L.R.B. No. 93 (1979), finding that the employer violated § 8(a)(1) and § 8(a)(3) of the Act. The Board has cross-petitioned for enforcement.

For the reasons discussed below, we grant the Board's cross-petition and enforce the order.

The employer is a public utility company engaged in the production, transmission, sale and distribution of electrical energy to customers in Missouri and Kansas. The employer and Locals 412, 1464 and 1613 of the International Brotherhood of Electrical Workers (hereinafter collectively referred to as the unions) have had a bargaining relationship since the early 1940's. Together the unions represent approximately 2,100 workers.

The applicable collective bargaining agreements were effective from July 1, 1976 through June 30, 1979. Each collective bargaining agreement contained a wage reopener clause providing that either party could reopen the agreement on June 30, 1978, for the purpose of adjusting wage rates and certain fringe benefits. The wage reopener clause further provided that in the event the parties were unable to reach an agreement, the clause in the collective bargaining agreement prohibiting strikes and lockouts was to be suspended, thereby leaving the unions free to strike in support of their bargaining position. The parties were unable to reach an agreement and the unions began a lawful economic strike on July 1, 1978. The strike continued until November 13, 1978.

When the employees returned to work, the employer required all probationary employees to begin the six-month probationary period anew.[1] In effect, the probationary employees returned to work as "new hires."[2] Thus, the time they had already served before the strike as probationary employees was lost and those benefits[3] that they would have received upon completion of the six-month probationary period were delayed, not for the balance of each employee's probationary period, but for six months.

The unions filed unfair labor practice charges, alleging that the employer's treatment of the probationary employees violated § 8(a)(1) and § 8(a)(3) of the Act. The employer justified its conduct by relying on the collective bargaining agreement provision requiring six months *continuous* service[4] as a probationary employee, its policy and past practice of requiring those proba-

---

1. The collective bargaining agreements define a "probationary employee" as any individual employed by the company for less than six continuous months. A "regular employee" is an individual who has been employed for six continuous months.

2. The parties sharply disagree over the appropriate characterization of the employer's treatment of the probationary employees. The administrative law judge (ALJ) and the Board describe the employer as treating the probationary employees "as though they had been terminated." The employer denies the probationary employees were terminated and notes that the paperwork associated with termination was never processed, the probationary employees were reinstated immediately following the strike, and the new six-month probationary period merely deferred the accrual of the benefits associated with regular employee status.

 This squabbling over semantic accuracy is beside the point. As noted in the text, the probationary employees were required to begin a new six-month probationary period following the strike. In practical effect, these employees began as "new hires."

3. Upon completion of the six-month probationary period, employees are credited with six months seniority and become eligible for a variety of benefits (sick leave, vacation, health and welfare coverage), including a wage step increase.

4. *E. g.*, Collective Bargaining Agreement between Kansas City Power & Light Co. and Local Union 1613, IBEW, 1976–79, art. V, § 1(a) ("The term 'probationary employee' means any individual engaged by the Company for regular employment without limitation as to time who has not completed *six months of continuous service* with the Company.") (emphasis added) (NLRB Ex. J1(c)).

tionary employees with interruptions in their probationary periods to begin anew, and the absence of discrimination because *all* probationary employees were required to start all over. The Board affirmed the decision of the administrative law judge (ALJ) that the employer's conduct was "inherently destructive" of employee rights and, even absent a showing of antiunion motivation, a violation of the Act under the standards set forth in *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 33–34, 87 S.Ct. 1792, 1797–98, 18 L.Ed.2d 1027 (1967), and further that the employer failed to establish "legitimate and substantial business justifications" for its conduct.

The Board ordered the employer to cease and desist from "discharging" or discriminating against employees who joined or participated in a lawful strike and in any like or related manner interfering with, restraining or coercing employees in the exercise of their § 7 rights. The Board further ordered the employer to give credit to all probationary employees "terminated" during the 1978 strike for all service prior to the date of the strike and, upon completion of the total six months employment, treat them as regular employees, giving them retroactive wage step increases and other benefits lost as a result of the employer's unfair labor practice.

In this petition to set aside the Board's order, the employer argues that (1) its conduct was not discriminatory and therefore could not constitute a violation of § 8(a)(3); and (2) its conduct was not "inherently destructive" of employee rights and therefore, in the absence of any affirmative showing of antiunion motivation, could not constitute a violation of § 8(a)(3) and § 8(a)(1).

Our review of the Board's decision is quite limited. If the Board's findings are supported by substantial evidence and represent a correct application of the law, the order will be enforced. 29 U.S.C. § 160(e); *e. g., The PaintSmiths, Inc. v. NLRB,* 620 F.2d 1326, 1329 (8th Cir. 1980), *citing Inter-Collegiate Press v. NLRB,* 486 F.2d 837, 840 (8th Cir. 1973), *cert. denied,* 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288 (1974).

■ First, the employer argues that because *all* the probationary employees were treated alike, its conduct was not discriminatory and therefore could not constitute a violation of § 8(a)(3). Discrimination is an essential element of a § 8(a)(3) violation. 29 U.S.C. § 158(a)(3).[5] This argument is clearly without merit. In *NLRB v. Jemco, Inc.,* 465 F.2d 1148 (6th Cir. 1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 911, 34 L.Ed.2d 690 (1973), the employer refused to pay accrued vacation benefits and argued, as the employer does in the present case, that no finding of discrimination, and thus no violation of § 8(a)(3), was possible where all the striking employees had been treated alike. The court rejected the employer's argument:

> Although we are not referred to, nor do we find, any cases involving Section 8(a)(3) discrimination where all employees alike were denied an employment benefit, *we do not believe that unequal treatment of different classes of employees is a prerequisite to finding a Section 8(a)(3) violation where all employees engaged in a concerted activity.* The interpretation of Section 8(a)(3) which the Company urges us to adopt would lead to the somewhat absurd result that an employer could never be found in violation of that Section so long as he was careful to treat all employees alike, no matter how destructive of employee rights his conduct may be. The Section 8(a)(3) discrimination in the present case lies in the employment benefit afforded to all employees prior to their engaging in a concerted activity and the

5. Under section 8(a)(3) of the Act, it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." In *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 233, 83 S.Ct. 1139,

1148, 10 L.Ed.2d 308 (1963), the Supreme Court held that discouraging membership in a labor organization under section 8(a)(3) includes discouraging participation in concerted activities, such as a legitimate strike.

*NLRB v. Borden, Inc.,* 600 F.2d 313, 320 (1st Cir. 1979).

benefit which was denied to all employees after they engaged in such activity. *Id.* 465 F.2d at 1152 (emphasis added; footnote omitted); *accord, NLRB v. Borden, Inc.,* 600 F.2d 313, 320–21 (1st Cir. 1979); *Allied Industrial Workers Local 289 v. NLRB,* 155 U.S.App.D.C. 112, 121, 476 F.2d 868, 877 (1973) ("A practice applied uniformly to all employees may be discriminatory and violate the Act just as a discriminatory practice may be held to be perfectly innocuous."). In other words, "[t]he fact that an employer stigmatizes striking employees while leaving nonstrikers untouched may be an indication of the employer's hostility toward the Union, but such disparity of treatment is not necessary to find a section 8(a)(3) and (1) violation." *NLRB v. Borden, Inc., supra,* 600 F.2d at 320.

 In the present case all the employees went on strike. The employer therefore could not have discriminated against striking employees and in favor of nonstriking employees. However, as discussed above, disparity in treatment *between strikers and nonstrikers* is not necessary to finding a § 8(a)(3) violation. *Id.* Where all the employees engage in a concerted activity, the requisite disparity is between the treatment of all employees *before and after the concerted activity. NLRB v. Jemco, Inc., supra,* 465 F.2d at 1152. Here, the requisite discrimination lies in the disparity of treatment of probationary employees with breaks in service before and after the strike. The General Counsel presented evidence that before the strike three probationary employees were not required to be-

gin their probationary periods anew even though absent from work between two to ten weeks. We conclude that the Board's finding of discriminatory treatment is supported by substantial evidence.

Next, the employer argues that its treatment of the probationary employees was not "inherently destructive" of important employee rights and was justified by "legitimate and substantial" business justifications. Therefore, the employer argues that absent an affirmative showing of antiunion motivation, its conduct could not constitute a violation of § 8(a)(3) and § 8(a)(1). *See NLRB v. Great Dane Trailers, Inc., supra,* 388 U.S. at 33–34, 87 S.Ct. 1197–98; *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 228–29, 83 S.Ct. 1139, 1145–46, 10 L.Ed.2d 308 (1963); *see generally* Christensen & Svanoe, *Motive & Intent in the Commission of Unfair Labor Practices: The Supreme Court & the Fictive Formality,* 77 Yale L.J. 1269 (1969).

The employer's argument is based upon the distinction drawn in *Great Dane* between discriminatory conduct which is "inherently destructive" of important employee rights and discriminatory conduct which has a "comparatively slight" adverse effect on employee rights. 388 U.S. at 34, 87 S.Ct. at 1797–98. As outlined in the familiar but somewhat enigmatic passage in *Great Dane* :

First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed[6] and the

---

**6.** Modern labor law cases, that is, post-*Radio Officers Union* cases, emphasize unlawful or antiunion motivation. "The statutory language 'discrimination ... to ... discourage' means that the finding of a violation normally turns on whether the discriminatory conduct was motivated by an antiunion purpose." *NLRB v. Great Dane Trailers, Inc., supra,* 388 U.S. at 33, 87 S.Ct. at 1797, *citing American Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). *See generally* 3 T. Kheel, Labor Law § 12.02 (1980); Janofsky, *New Concepts in Interference & Discrimination under the NLRA: The Legacy of* American Ship *& Great Dane,* 70 Colum.L.Rev. 81(1970); Oberer, *The Scienter Factor in Sections 8a1 & 3 of the*

*Labor Act: Of Balancing, Hostile Motive, Dogs & Tails,* 52 Cornell L.Q. 491, 504–06 (1967) (explaining use of words "motive" and "intent" in Supreme Court opinions); Note, *Proving an 8a3 Violation: The Changing Standard,* 114 U.Pa.L.Rev. 866 (1966). *But see* 3 T. Kheel, Labor Law, *supra,* § 12.02 (discussing the "varient view"); Christensen & Svanoe, *Motive & Intent in the Commission of Unfair Labor Practices: The Supreme Court & the Fictive Formality,* 77 Yale L.J. 1269 (1968) (emphasizing discrimination, irrelevance of intent or motive); Note, *Discrimination & the NLRB: The Scope of Board Power under 8a3 & 8b2,* 32 U.Chi.L. Rev. 124 (1964).

Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations.[7] Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proven to sustain the charge *if* the employer comes forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

388 U.S. at 34, 87 S.Ct. at 1797–98 (emphasis in original; footnotes added).

■■■ "Finding a § 8(a)(3) violation normally requires an affirmative showing that the employer's discriminatory conduct was motivated by an antiunion purpose. But when an employer's conduct is characterized as 'inherently destructive,' 'unlawful motivation is presumed to exist.'" *Loomis Courier Service, Inc. v. NLRB*, 595 F.2d 491, 495 (9th Cir. 1979) (other citations omitted), *citing Western Exterminator Co. v. NLRB*, 565 F.2d 1114, 1118 n.3 (9th Cir. 1977). Thus, the characterization of discriminatory conduct as either "inherently destructive"

or having a "comparatively slight" adverse effect is critical because that characterization determines which party has the benefit of a presumption of lawful or unlawful motivation, once a showing of "legitimate and substantial business justification" has been made. "Inherently destructive" discriminatory conduct bears "its own indicia of intent" and thus relieves the General Counsel of the difficult task of proving unlawful motivation. *NLRB v. Erie Resistor Corp., supra*, 373 U.S. at 231, 83 S.Ct. at 1147. Even if the employer establishes a "legitimate and substantial business justification" for "inherently destructive" conduct, the presumption of unlawful motivation remains, leaving to the Board the "delicate task" of balancing conflicting legitimate interests in light of the Act and its policy. *E. g., NLRB v. Great Dane Trailers, Inc., supra*, 388 U.S. at 33–34, 87 S.Ct. at 1197–98; *NLRB v. Erie Resistor Corp., supra*, 373 U.S. at 228–29, 83 S.Ct. at 1145–46; *Johns-Manville Products Corp. v. NLRB*, 557 F.2d 1126, 1144 (5th Cir. 1977) (Wisdom, J., dissenting) (express reference to balancing respective interests in order to draw correct inference about real motive of employer), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1386 (9th Cir. 1976) (express reference to balancing). Discriminatory conduct which has only a "com-

---

7. The employer in such cases must be held to intend the very consequences which foreseeably and inescapably flow from his actions and if he fails to explain away, to justify or to characterize his actions as something different than they appear on their face, an unfair labor practice charge is made out. But, as often happens, the employer may counter by claiming that his actions were taken in the pursuit of legitimate business ends and that his dominant purpose was not to discriminate or to invade union rights but to accomplish business objectives acceptable under the Act. Nevertheless, his conduct *does* speak for itself—it *is* discriminatory and it *does* discourage union membership and whatever the claimed overriding justification may be, it carries with it unavoidable consequences which the employer not only foresaw but which he must have intended. As is not uncommon in human experience, such situations present a complex of motives and

preferring one motive to another is in reality the far more delicate task, reflected in part in the decisions of this Court, of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct.

*NLRB v. Erie Resistor Corp., supra*, 373 U.S. at 228–29, 83 S.Ct. at 1145–46 (emphasis in original; citation and footnotes omitted); *see, e. g., Johns-Manville Prods. Corp. v. NLRB*, 557 F.2d 1126, 1144 (5th Cir. 1977) (Wisdom, J., dissenting) (discussing balancing of employee and employer interests), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Kaiser Eng'rs v. NLRB*, 538 F.2d 1379, 1386 (9th Cir. 1976) ("The ultimate problem is the balancing of conflicting legitimate interests.").

paratively slight" adverse effect on employee rights similarly raises a presumption of unlawful motive. However, if rebutted by a showing of "legitimate and substantial business justification," the presumption of unlawful motive disappears, the conduct in question is prima facie lawful, and the General Counsel must affirmatively prove unlawful motive. *E. g., NLRB v. Great Dane Trailers, Inc., supra,* 388 U.S. at 34, 87 S.Ct. at 1797–98; *Johns-Manville Products Corp. v. NLRB, supra,* 557 F.2d at 1144 (Wisdom, J., dissenting).

The Supreme Court has yet to clearly define the phrase "inherently destructive."[8] This Circuit in *Inter-Collegiate Press v. NLRB,* agreeing that the phrase was not easily susceptible of precise definition, acknowledged that "actions creating visible and continuing obstacles to the future exercise of employee rights" are "inherently destructive." 486 F.2d at 845, *citing* Case Note, 85 Harv.L.Rev. 680, 686 (1972); *accord, Loomis Courier Service, Inc. v. NLRB, supra,* 595 F.2d at 495, *citing Portland Willamette Co. v. NLRB,* 534 F.2d 1331, 1334 (9th Cir. 1976) (conduct with far-reaching effects which would hinder future bargaining or conduct which discriminates solely upon the basis of participation in strikes or union activity is inherently destructive); *Johns-Manville Products Corp. v. NLRB, supra,* 557 F.2d at 1144 (Wisdom, J., dissenting) ("inherently destructive" describes conduct that thwarts the basic policies of the Act and frustrates the process of collective bargaining or the future of unionization, but not conduct merely influencing workers' ability to maintain their bargaining demands); *Kaiser Engineers v. NLRB, supra,* 538 F.2d at 1386 (discriminatory conduct which is directly related to protected activity is inherently destructive, *citing Signal Oil & Gas Co. v. NLRB,* 390 F.2d 338, 343–44 (9th Cir. 1968)).

While there is much to be said for the Board's characterization of the employer's treatment of the probationary employees as "inherently destructive," it is unnecessary here for us to decide whether the employer's conduct was "inherently destructive" or whether its effect was "comparatively slight" since in either event the result is the same. The employer's conduct was directly related to the probationary employees' participation in a lawful economic strike, a protected activity under the Act. *E. g., NLRB v. Westinghouse Electric Corp.,* 603 F.2d 610, 617 (7th Cir. 1979); *NLRB v. Knuth Bros.,* 584 F.2d 813, 815 (7th Cir. 1978) (§ 8(a)(1) violation); *NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835, 840–42 (5th Cir. 1978); *Kellogg Co. v. NLRB,* 457 F.2d 519, 522 (6th Cir.), *cert. denied,* 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972), *citing NLRB v. Erie Resistor Corp., supra,* 373 U.S. at 233, 83 S.Ct. at 1148; *cf. System Council T–4 v. NLRB,* 446 F.2d 815, 819 n.7 (7th Cir. 1971) (adjustment of net credit service dates, as distinguished from seniority, to account for strike time found to have "comparatively slight" adverse effect on employee rights within context of *Great Dane*), *cert. denied,* 404 U.S. 1059, 92 S.Ct. 740, 30 L.Ed.2d 747 (1972); *Tex-Tan Welhausen Co. v. NLRB,* 419 F.2d 1265 (5th Cir. 1969) (benefit adjustment for strike absence), *vacated on other grounds,* 397 U.S. 819, 90 S.Ct. 1516, 25 L.Ed.2d 805 (1970). Such conduct, when considered from a common sense point of view, is bound to have a discouraging effect on present and future concerted activities, particularly upon the probationary employees' support of the unions. The inevitable consequence of the application of the employer's policy with regard to absences during the probationary period is that probationary employees can strike for one week, or possibly at most for one month,[9] without jeopar-

---

**8.** In *Great Dane* the Court describes "inherently destructive" conduct as "conduct [which] carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.'" 388 U.S. at 33, 87 S.Ct. at 1797, *citing NLRB v. Erie Resistor Corp., supra,*

373 U.S. at 228, 231, 83 S.Ct. at 1145–47; *see generally* 3 T. Kheel, Labor Law, *supra* note 6, § 12.02.

**9.** The employer's then director of employee relations, Mr. Feild, testified that the policy with regard to absences during the probationary pe-

dizing their accrued probationary service. Such an action creates an obstacle of some dimension to the future exercise of employee rights. *Inter-Collegiate Press v. NLRB,* *supra,* 486 F.2d at 845.

We recognize that the employer did present evidence tending to show that it was motivated by legitimate objectives in requiring all the probationary employees to start anew, that is, the enforcement of its six months continuous service policy. However, there was evidence in the record that the employer's policy was unwritten, flexible, and administered with some discretion by supervisors, and that within the past several years three probationary employees with substantial breaks in service had not been made to begin the probationary period anew.

As the ALJ found, the testimony offered in justification of the six months rule was conclusory and was not supported by any specific evidence—"for instance why the company found it necessary to terminate one who had completed 5 months and 3 weeks."

In the circumstances, we agree with the Board that the employer's assertions fall short of showing substantial and legitimate business considerations and hold that the employer failed to carry its burden of justifying its conduct.

We distinguish *NLRB v. National Seal, Division of Federal-Mogul-Bower Bearings, Inc.,* 336 F.2d 781 (9th Cir. 1964), *denying enforcement in* 141 N.L.R.B. 661 (1963). In this pre-*Great Dane* case, the employer applied a probationary rule that the probationary period of 60 days was required to be completed without interruption to striking probationary employees. The rule was of long standing and had been rigidly enforced prior to the strike. In addition, the parties had stipulated that the employer's sole motive in terminating the striking probationary employees was that the employer wanted all probationary periods to be continuous and unbroken. The court denied enforcement of the Board order, declining to adopt a per se rule on the application of otherwise lawful probationary rules to economic strikers, *id.* at 783, *citing Quality Casting Co.,* 139 N.L.R.B. 928 (1962), *enforcement denied,* 325 F.2d 36 (6th Cir. 1963), and stressing the absence of evidence of unlawful motivation. 336 F.2d at 784–85. In the instant case we note that the employer's probationary policy was more in the nature of a guideline and not "rigidly enforced."

■ Further, we are not persuaded by the employer's argument that its treatment of the probationary employees was compelled by the collective bargaining agreement and was the lawful implementation of a right required through the bargaining process.[10] *See G. C. Murphy Co.,* 207 N.L.R.B. 579 (1973); *Roegelein Provision Co.,* 181 N.L.R.B. 578 (1970). In both of those cases the Board found that the denial of accrued vacation benefits by the employer pursuant to an express provision in the collective bargaining agreement constituted "a lawful implementation of a right understood to have been acquired through the collective bargaining process." *G. C. Murphy Co., supra,* 207 N.L.R.B. at 582; *Roegelein Provision Co., supra,* 181 N.L.R.B. at 580. *But see G. C. Murphy Co., supra,* 207 N.L.R.B. at 579–80 (Member Fanning, dissenting). In each case there was negotiating history that included repeated discussions about the meaning and scope of the provisions. In contrast, the negotiating his-

riod was unwritten and flexible, its general guidelines "generally understood" by the supervisors. Feild further testified that, although not fixed, an absence lasting up to a week was permissible but absences of a month were generally not, leaving absences between a week and a month as a "gray area" to be handled on an individual basis.

**10.** This position comes close to an argument that the probationary employees' right to strike was waived by the collective bargaining agree-

ment, specifically by the provision defining probationary employees as individuals with less than six months continuous service. However, although the right to strike may be waived by appropriate provisions in a collective bargaining agreement, such a waiver of a protected right must be expressed in clear and unmistakable language. *E. g., Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 280, 76 S.Ct. 349, 357, 100 L.Ed. 309 (1956).

tory in the present case is meager: in the 1974 strike settlement agreement the application of the six months continuous service requirement was suspended, while the settlement agreement for the 1978 strike at issue here did not address the problem. With the exception of the 1974 strike (83 days) and the 1978 strike (4.5 months), past strikes against the company apparently were much shorter and the applicability of the six months continuous service requirement to breaks in service did not become an issue. In any case, we would be very reluctant to find a limitation of the right to strike by probationary employees effected by the language of the provision of the collective bargaining agreement in question here. *See* note 10 *supra*.

In sum, the Board's finding of an unfair labor practice is supported by substantial evidence on the record as a whole. Accordingly, the order of the Board is enforced.